ESTATE OF WALTER K. DEAN, Deceased, LAURIN D. DEAN and PATRICK G. EMMANUEL, Co-Executors, and LAURIN D. DEAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Dean v. Commissioner
Docket No. 4982-71
United States Tax Court
T.C. Memo 1975-137; 1975 Tax Ct. Memo LEXIS 236; 34 T.C.M. (CCH) 631; T.C.M. (RIA) 750137; May 8, 1975, Filed Hugh R. Dowling,H. Vernon Davids and William D. McFarlane, Jr., for the petitioners. Kenneth B. Wheeler, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax against Walter K. Dean and Laurin D. Dean as follows: Year Amount 1967 $ 31,340.88
1968 4,921.69
Total $ 36,262.57 Walter K. Dean died after filing the petition herein and *237 his estate was substituted for him as a petitioner. For convenience, the deceased, Walter K. Dean, will be referred to as petitioner. Certain adjustments made by the Commissioner in his statutory notice of deficiency have either been conceded or not raised by the petitioners. The following issues remain for decision: (1) Whether a subdivided tract of land sold by petitioners' subchapter S land development and construction corporation qualified as a capital asset within the meaning of section 1221 of the Internal Revenue Code. [1]
(2) Whether, under section 162 of the Code, $ 1,500 paid by petitioners' subchapter S corporation to its former vice president while he was serving full-time as a high state official qualified as an ordinary and necessary business expense of the corporation deductible in 1967. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated by reference. Walter K. Dean (now deceased) and Laurin D. Dean were husband and *238 wife during the years in issue. They filed their joint Federal income tax returns for the taxable years 1967 and 1968 with the Southeast Internal Revenue Service Center at Chamblee, Georgia. Walter K. Dean died on June 17, 1972, after the petition herein was filed and his estate was substituted for him as a petitioner. Walter K. Dean, during the years in issue, was the sole shareholder and president of Warrington Home Builders, Inc. (Warrington). Warrington is a Florida corporation organized on September 8, 1948. During the years in issue, Warrington's primary business was development of raw real estate by building residences for ultimate sale using VA and FHA financing. It elected to become a subchapter S corporation in January 1964. Warrington filed its U.S. Small Business Corporation returns for the taxable years 1967 and 1968 with the Southeast Internal Revenue Service Center at Chamblee, Georgia. In 1954, Warrington acquired an option on undeveloped real property. In January 1956, pursuant to the option, Willie Mae Boley Bell sold 91 acres of the undeveloped land to Warrington for $ 42,940. In 1957, Warrington platted this tract as the Wildewood subdivision. On May 29, 1958, Warrington *239 executed and filed a declaration of restrictive covenants covering blocks 1 through 12, Wildewood subdivision. There were no zoning ordinances effective in Escambia County, Florida, (where Wildewood was located) when the Wildewood subdivision was platted and the declaration of restrictive covenants filed. As a result of the preliminary layouts, block 10 of Wildewood was a triangular-shaped property separated from the rest of the subdivision by main thoroughfares on two sides and a railroad on the other. A power transformer station was located across the street and an electrical power easement also separated this property from the remainder of the subdivision. The noise factor, plus the fact that it would not be economically practical to cut a main thoroughfare to install a water distributionsewage collection system for a single block, resulted in Warrington's decision to remove the restrictive covenants from block 10. On February 5, 1959, Warrington executed and filed an amendment to the restrictive covenants dated May 29, 1958. By this amendment, Warrington released block 10, lots 1 through 14, of the Wildewood subdivision from all of the previously filed restrictive covenants. *240 No lots in the Wildewood subdivision had been sold as of February 5, 1959. The plat map of the Wildewood subdivision as filed in 1957 and recorded in the public records of Escambia County was not changed in 1959 when the restrictive covenants on block 10 were abrogated and even today it shows block 10 subdivided into 14 lots. It was not difficult or expensive to remove the lot lines dividing black 10 of Wildewood subdivision into 14 lots. [2] Following the removal of restrictive covenants from block 10, there were no restrictions on the use or disposition of this property. In 1954, when Warrington acquired the option to the Bell property, which became Wildewood subdivision, Beverly Parkway ran through the property. When Warrington purchased the Bell property, it was aware that the State of *241 Florida was seeking a right-of-way along Beverly Parkway. In August 1956, the Florida State Road Department acquired property by condemnation across the northeastern corner of the Wildewood subdivision as a right-of-way for Beverly Parkway in return for which Warrington was awarded the sum of $ 21,214.84, plus attorney's fees. In 1956, Warrington set aside $ 15,460 of the Beverly Parkway condemnation award as a reserve for improvement of drainage of the property involved in Wildewood subdivision (including block 10). Block 10 is bounded by Michigan Avenue, Beverly Parkway and the St. Louis-San Francisco Railroad track. When the Bell property was purchased in 1956, an electrical power transformer substation was located on the property across Michigan Avenue from what became block 10 of the Wildewood subdivision. At the time Wildewood subdivision was platted and the plat was recorded, Beverly Parkway was a widened and improved state road that separated block 10 from the other 11 blocks of the subdivision. FHA and VA subdivision regulations significantly affected the development of the Wildewood subdivision. Warrington obtained FHA approval for the entire Wildewood subdivision, blocks *242 1 through 12 as originally platted. Prior to approving a subdivision, FHA reviews the proposed development program to determine if there is a market for the building sites and requires a builderdeveloper to show that consideration has been given to providing storm drain engineering, sewer and other utilities and uniform restrictive covenants. In granting Warrington approval for the entire Wildewood subdivision, blocks 1 through 12, FHA was satisfied that there was a market for those building sites and that engineering studies undertaken by Warrington had set forth the requirements and specifications regarding water, sewer, electricity and drainage for the entire subdivision. Warrington sold all but one or two of the houses in the Wildewood subdivision by December 31, 1960, and the remaining houses were sold by the end of 1961. Block 10 did not qualify for FHA approval after the restrictive covenants were removed therefrom. Removing the restrictive covenants from block 10 had an adverse effect on the value of the lots facing block 10 across Beverly Parkway and they were suitable for FHA financing only at a reduced value. In 1958 or 1959, Warrington considered constructing a commercial *243 building referred to as a strip development on block 10. Petitioner rejected the proposal of a strip development or a month-to-month lease operation on block 10. He did not "care" for that type of operation. If a supermarket, major department store or similar blue chip operation could have been found to occupy block 10, however, petitioner would have considered selling the property. During the years in issue, Mr. Bernard M. Hite of Pensacola, Florida, was a registered real estate broker specializing in commercial and vacant properties. In early 1967, after determining ownership of block 10, Mr. Hite approached petitioner to ascertain whether he was interested in selling the property. All meetings between Mr. Hite and petitioner regarding the property in issue took place at Warrington's office on Mobile Highway in Pensacola, Florida. Petitioner advised Mr. Hite that he was interested in selling block 10. By letter dated May 4, 1967, petitioner advised Mr. Hite that he was at liberty to offer the property in issue for sale at $ 95,000. The same letter further authorized Mr. Hite to sell blocks F and G in Garnier Beach subdivision in Fort Walton, Florida. Mr. Hite was to receive *244 a 10 percent commission on sale of these properties. Mr. Hite was unable to find a buyer for blocks F and G. In September 1967, after being contacted by Mr. Hite, Delchamps of Mobile, Alabama (Delchamps), advised Mr. Hite that it was going to offer $ 75,000 to Warrington for block 10 and that this offer was the only one they were going to make. That was the first offer received by Warrington for block 10. Warrington, through petitioner, accepted the offer and sold block 10 in a single parcel to Delchamps. The sales agreement and contract for sale between Warrington and Delchamps is dated September 28, 1967. The sale to Delchamps was consummated and the deed for the property was recorded in 1967. By letter dated September 28, 1967, Bernard M. Hite agreed to accept from petitioner the sum of $ 5,500 as a real estate sales commission on the sale of the real property here in issue. When the property that was to become Wildewood subdivision was purchased by Warrington from Willie Mae Boley Bell in 1956, it was recorded in an asset account entitled, Land Investment, in which was kept a record of the land Warrington purchased for development. As the lots in the Wildewood subdivision were *245 sold, the Land Investment account was reduced to reflect the sales. In the 1956 auditor's report for Warrington, the 91 acres purchased from Willie Mae Boley Bell was shown to cost $ 40,653.05, was designated the Bell property and was listed under a current asset account entitled, "Land for Development." In addition, the report for 1956 shows that Warrington sold 35 acres of undeveloped land in Fort Walton Beach and 4 acres of undeveloped land in Washington Heights. In 1956, Warrington also sold 19 rental houses in the Edgewater subdivision and in Fort Walton Beach and 35 lots in Fort Walton Beach. Note 3 to the statement of gross profit accompanying the income statement for 1956 states that Warrington treated the proceeds of those sales as long-term capital gain. In the auditor's report for 1957, the Bell property is listed as a current asset entitled "Land Held for Development." In the auditor's report for 1959, Tristan Village (also known as Wildewood subdivision) is listed as a current asset under the subheading, "Land for Development," which is broken down into completed construction and other property. Approximately 60 units had been completed in Tristan Village (Wildewood *246 subdivision) and 45 units, including lots 1 through 14 of block 10, remained uncompleted and are shown as having a cost value of $ 7,298.15. No mention is made in the auditor's report for 1959 of any change in asset character of block 10. In the auditor's report for 1961, block 10 was included as a current asset under "Land for Development," subtitled "Other Lots and Parcels" and shown as Tristan Village, 14 lots with an allocated cost basis of $ 2,270.47. In the 1964 auditor's report, block 10 is included as a current asset under "Land Held for Development and Resale" and was part of the total shown on the balance sheet of $ 677,399. The auditor's reports for 1965 and 1966 for Warrington do not describe block 10 as an investment. In the auditor's adjusting entries dated March 31, 1965, adjusting entry No. 4 reclassified the accounts listed therein to agree with the prior year's (March 31, 1964) report and made the following adjustments: Entry No. 4 credits Land and Development Costs, account No. 10450, in the amount of $ 608,685.47 and debits a series of new accounts which, by title, correspond to various subdivisions or properties owned and developed by Warrington. Included in *247 these debits is Wildewood (1) account No. 10450-5 (later to become account No. 14110-3) in the amount of $ 2,270.47, the allocated cost basis of the 14 lots in block 10, Wildewood subdivision. The block 10 property (Wildewood - Code 1) was treated in adjusting entry No. 4 exactly the same way as the other subdivision accounts. In its books and records for 1967, Warrington treated the 1967 sale of block 10 the same as it would any other sale of a lot with a house on it by crediting the proceeds to the house sales account (instead of to an investment account). The house sales account was closed to profit and loss which in turn was closed to shareholders' undistributed income for 1967. Warrington's independent auditors made entries on Warrington's books for 1967, closing income, costs and expenses to profit and loss, wherein there appears the notation, "Wildewood - Code 1" and the account No. 14110-3 and the figure $ 2,270.47. The cost of Wildewood block 10 was treated as a cost in determining the profit and loss from operations of Warrington for the year 1967. The auditor's adjusting and closing entries for 1967 also indicate that the various costs of the sale of block 10 such as *248 commissions, outside brokers, interest on notes and mortgages, and realty, personal property and state capital taxes were closed to profit and loss. While the 1967 ledger sheet entitled "Wildewood - Code 1, account No. 14110-3" dated January 1, 1967, showed a $ 2,270.47 balance, the same account showed no balance on January 1, 1968. In the 1967 auditor's report, the 1967 sale of block 10 for $ 75,000 was set out separately in the Statement of Gross Profit under "House Construction, Sales," and the $ 2,270.47 cost of the property was separately stated under "Cost of Sales, Land." No construction costs or indirect costs were allocated to the sale of the land in issue. However, the sales proceeds from and the cost of block 10 were included in the total sales and cost of sales used to compute Warrington's 1967 gross profit from operations as reflected in the 1967 income statement. There was no mention of any sales of capital assets nor was block 10 listed under "Other Assets" or "Other Income." From its acquisition in 1956 until its sale in 1967, block 10 was treated in all the above-described auditior's reports as a current asset. Such reports never treated the property as a fixed *249 asset or as an investment asset. Petitioner, in 1967, owned 50 percent of the Paramount Shopping Center of Fort Walton Beach, Florida, which is in the vicinity of the third, fourth, fifth and sixth additions to the Garnier Beach subdivision. The seventh addition to the Garnier Beach subdivision was developed, platted and built by Warrington. The plat map of the seventh addition to the Garnier Beach subdivision shows two blocks marked F and G at the entrance to the subdivision, either of which were subdivided into lots and on one of which there are now commercial buildings. In 1972, Warrington, by quit claim deed transferred blocks F and G of the seventh addition, Garnier Beach subdivision, to Dean Realty, of which company petitioner was also president. The Mayfair subdivision in Pensacola, Florida, was subdivided and built by Warrington. On the plat map of the Mayfair subdivision, Warrington reserved two triangular-shaped lots which were entitled "Commercial Areas." The office of Warrington Home Builders was located on one of the two triangular lots in the Mayfair subdivision. The Mayfair Construction Co., from which petitioners reported income and losses on their returns for 1967 *250 and 1968, respectively, engaged in the business of constructing commercial buildings. During the years in which the Wildewood subdivision was being developed, signs were posted advertising the subdivision as a whole as a desirable place to live. None of the lots in the Wildewood subdivision ever had a "for sale" sign posted on them before a home had been completed on the lot. Mr. Jeptha L. Larkin (Mr. Larkin) during the period from 1955 until 1965 was the chief administrative officer (vice president) of Warrington. Mr. Larkin's job was confined to matters concerning the housing division. He was not familiar with all of petitioner's many property holdings and was not aware of every commercial property sale made by Warrington or petitioner. Following his employment as vice president of Warrington, Mr. Larkin, in September 1965, was appointed Deputy Comptroller of the State of Florida until July 1969 when he became Director of Construction and Maintenance for the State of Florida. During 1967, Mr. Larkin received approximately $ 300 a month from Warrington for five months for a total of $ 1,500. The money received by Mr. Larkin was compensation or reimbursement of his expenses in *251 connection with a project known as "Pensacola Village." On its 1967 U.S. Small Business Corporation return, Warrington reported the gain realized from the sale of "14 lots in Wildwood [sic]" as a capital gain but deducted $ 311.30 of "Closing Costs Paid for Customers" attributable to the sale of block 10 as a selling expense incurred by the corporation. The Commissioner, in his statutory notice of deficiency, determined that the gain realized by Warrington from the sale of "14 lots of Wildwood [sic]" was taxable as ordinary income under section 61 of the Internal Revenue Code of 1954 rather than as capital gain as reported on Warrington's return. The Commissioner disallowed $ 1,500 in purported selling expenses claimed by Warrington in 1967 because petitioner allegedly failed to establish that such items were ordinary and necessary business expenses under section 162, or were expended for the purposes designated. ULTIMATE FINDINGS 1. Block 10 of the Wildewood subdivision, at the time of its sale in 1967, was held by Warrington for investment purposes and not for resale to its customers in the ordinary course of business. 2. The $ 1,500 which was paid *252 to Mr. Larkin in 1967 did not constitute an ordinary and necessary business expense of Warrington or of petitioners in that year. OPINION The first issue presented for our decision is whether a subdivided tract of land sold by petitioners' subchapter S land development and construction corporation qualified as a capital asset within the meaning of section 1221. Respondent rejects petitioners' claim that while the corporation originally acquired the land in issue primarily for sale to customers in the ordinary course of its business, the gain on its sale must be treated as capital gain rather than ordinary income because at the time of sale Warrington held the property for investment. Subchapter P, section 1201, et seq., Internal Revenue Code of 1954, provides for special treatment of gains recognized on the sale of capital assets. Section 1221(1) excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In Malat v. Riddell,383 U.S. 569, 572 (1966), the Supreme Court concluded with respect to this statutory provision: The purpose of the statutory provision *253 with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * [citation omitted] and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * * [Citation omitted.] A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in section 1221(1), "primarily" means "of first importance" or "principally." Because the capital gains provision represents "an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly" in order "to effectuate the basic Congressional purpose." Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955); Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 265 (1958). It is well established that a taxpayer in the real estate business may hold real estate as an investment. Randolph D. Rouse,39 T.C. 70 (1962); *254 Eline Realty Co.,35 T.C. 1 (1960); Charles E. Mieg,32 T.C. 1314 (1959); Walter R. Crabtree,20 T.C. 841 (1953). However, the issue of whether at the time of sale property was held for investment or primarily for sale to customers in the ordinary course of the taxpayer's trade or business is solely a question of fact and each case necessarily turns upon its own peculiar facts viewed in light of all the surrounding circumstances. United States v. Winthrop,417 F. 2d 905 (C.A. 5, 1969); Thompson v. Commissioner,322 F.2d 122 (C.A. 5, 1963), affirming 38 T.C. 153 (1962); W. T. Thrift, Sr.,15 T.C. 366 (1950). A number of factors have been considered in resolution of this issue. See United States v. Winthrop,supra;Smith v. Dunn,224 F.2d 353 (C.A. 5, 1955); Goldberg v. Commissioner,223 F.2d 709 (C.A. 5, 1955); Maddux Construction Co.,54 T.C. 1278 (1970); *255 Ralph J. Oace,39 T.C. 743 (1963); and James G. Hoover,32 T.C. 618 (1959). No single factor, or combination of factors, is controlling. Thompson v. Commissioner,supra;Wood v. Commissioner,276 F.2d 586, 590 (C.A. 5, 1960); W. T. Thrift, Sr.,supra.Respondent's determination is presumptively correct and petitioner has the burden of proof. While it is arguable that at one time or another Warrington was in the general real estate business, see Municipal Bond Corp.,46 T.C. 219 (1966), affirmed in part and reversed in part 382 F.2d 184 (C.A. 8, 1967); Eline Realty Co.,supra, the record clearly shows that at the time of sale of the property in question Warrington engaged primarily in the business of acquiring unimproved real estate, subdividing and developing the land by installing improvements (streets, curbs, utilities) and building houses thereon for sale to the public using VA and FHA financing. The fact that the property in issue is the remnant of a larger tract of land purchased for development and sale to customers in the ordinary *256 course of its business does not prevent petitioners from prevailing on this issue. Although the underlying purpose of the acquisition is to be given consideration, that purpose is necessarily subject to change. Ridgewood Land Co., Inc., v. Commissioner,477 F.2d 135 (C.A. 5, 1973), affirming a Memorandum Opinion of this Court; United States v. Winthrop,supra.Petitioners must prove sufficient facts to satisfy us that at the time of sale, Warrington's purpose for holding the property in question had changed to an investment purpose. Maddux Construction Co.,supra;Herzog Building Corp.,44 T.C. 694 (1965); Eline Realty Co.,supra;Carl Marks & Co.,12 T.C. 1196 (1949). Respondent argues that when presented with a question of changed taxpayer intent, the courts have generally held that such a change must either be the result of some material change of circumstances beyond the control of the taxpayer or there must be an objective manifestation of the new intent. He contends that there was neither a material change of circumstance beyond Warrington's control nor *257 an objective manifestation of Warrington's intent to change the character of block 10 to investment property. Thus, respondent concludes that in the absence of either of the above, the remaining factors referred to at the outset of this opinion have considerably less significance. In support of this argument, respondent cites and discusses several cases. Ridgewood Land Co., Inc.,supra;Tri-S Corp.,48 T.C. 316 (1967), affd. 400 F.2d 862 (C.A. 10, 1968); Estate of Freeland v. Commissioner,393 F.2d 573 (C.A. 9, 1968); Williams v. United States,329 F.2d 430 (C.A. 5, 1964); Baker v. Commissioner,248 F.2d 893 (C.A. 5, 1957); Maddux Construction Co.,54 T.C. 1278 (1970); Herzog Building Corp.,supra;Donald J. Lawrie,36 T.C. 1117 (1961); Eline Realty Co.,35 T.C. 1, (1960). Warrington's former vice president testified that after the Bell property was purchased, preliminary layouts of the Wildewood subdivision were made in which block 10 resulted in a triangular-shaped property, separated from the rest *258 of the subdivision by thoroughfares on two sides and a railroad on the other. A power transformer station was located across the street and an electrical power easement also separated block 10 from the remainder of the subdivision. The noise factor plus the fact that it would not be economically practical to cut a main thoroughfare to install a water distributionsewage system for a single block resulted in Warrington's decision to remove the restrictive convenants from block 10 on February 5, 1959. While these features were present when Warrington purchased the Bell property and thus no material change in circumstances occurred, Warrington's former vice president testified that Warrington did not realize that such features rendered block 10 unsuitable for residential development until after the Bell property was purchased and the preliminary layout of the subdivision was made. We cannot ignore such credible, uncontradicted and unimpeached testimony. Rather than a material intervening change of circumstances beyond the control of Warrington, we have a circumstance which could not be easily changed by Warrington. Respondent does not contend that these circumstances were within Warrington's *259 control. Without agreeing or disagreeing with respondent's argument as to the general rule regarding circumstances evidencing changed taxpayer intent, we emphasize that this Court does not require a showing of a material change of circumstances beyond the taxpayer's control in order for Warrington to prevail on this issue. Louis Lesser,42 T.C. 688 (1964), affd. 352 F.2d 789 (C.A. 9, 1965), certiorari denied 384 U.S. 927 (1966). We believe Warrington's circumstances strongly support petitioners' objective evidence of changed taxpayer intent discussed below. Although Warrington failed to amend the plat map of Wildewood subdivision (by removing the lot lines dividing block 10 into 14 lots) when the restrictive covenants on block 10 were abrogated, Warrington's vice president and Warrington's attorney both testified that such action was not necessary because the lot lines were no legal impediment to the sale of the property. Certainly, the sale to Delchamps corroborates this uncontradicted testimony. From its acquisition in 1956 until its sale in 1967, block 10 was treated in every auditor's report in evidence as a current asset held primarily *260 for sale to customers in the ordinary course of Warrington's business. In the corporation's books for 1967, Warrington treated the sale of block 10 the same as it would any other sale of a lot with a house on it by crediting the proceeds to the house sales account (instead of crediting an investment account). Although this Court has looked to a taxpayer's books and records for objective evidence of an intent to change the character of an asset, W. Linton Atkinson,31 T.C. 1241 (1959); Herzog Building Corp.,44 T.C. 694 (1965); Walter R. Crabtree,20 T.C. 841 (1953); Carl Marks & Co., 12 T.C. 1196 (1949), failure to find such evidence is not conclusive and will not, of itself, preclude a showing of changed intent by reference to other factors and circumstances. Ridgewood Land Co., Inc. v. Commissioner,477 F.2d 135 (C.A. 5, 1973); Commissioner v. Pontchartrain Park Homes, Inc.,349 F.2d 416 (C.A. 5, 1965), affirming a Memorandum Opinion of this Court. Based on the entire record and for the reasons already discussed, we conclude that on or before February 5, 1959, Warrington abandoned *261 its intention to develop block 10 for residential purposes and decided to hold the property for investment purposes, either as rental property or for eventual sale at a profit. On or before February 5, 1959, Warrington realized that because of the location and high development costs, block 10 could not be most profitably used as residential property. The objective evidence shows that on February 5, 1959, Warrington removed the restrictive covenants from block 10. Although the testimony does not pinpoint the precise date, sometime shortly before or after removal of the restrictions on block 10, Warrington considered commercial development of the property. Nothing tangible ever developed and the idea apparently was not pursued. Block 10 did not qualify for FHA approval after the restrictive covenants were removed. In addition to its undesirable location for residential development, nonavailability of FHA insurance applicable to block 10 further reduced the market for this property in the ordinary course of Warrington's business because Warrington relied on FHA financing of its house sales. Other factors support our conclusion that at the time of sale of block 10 to Delchamps in 1967, *262 Warrington held that property for investment purposes. Of all the factors referred to above, only one is favorable to the respondent. That is, Warrington initially held block 10 for sale to customers in the ordinary course of its business. In support of the petitioners, Warrington held block 10 for 8 years after it was determined to be unsuitable for residential use in 1959 and 6 years after the last house was sold in Wildewood subdivision in 1961. Although lines dividing block 10 into 14 lots were never removed from the plat of Wildewood subdivision, no substantial improvements of any kind were made to the property. [3]
*263 Other than the 1956 sale of raw acreage, rental houses and lots resulting in profits reported as capital gains which apparently were not challenged by the Commissioner, the sale of block 10 was the only transaction of its kind effected by Warrington during the entire 11 years the property was held. At the time of the sale of block 10, Warrington engaged primarily in the business of acquiring unimproved real estate, subdividing and developing the land by installing improvements and building houses thereon for sale to the public using VA or FHA financing. Warrington had no customers for commercial property in the ordinary course of its business. Warrington erected no signs on block 10, did not advertise the property in the newspaper and did not actively solicit the sale of the land in issue. Mr. Hite, the broker involved in the sale of block 10, approached petitioner, president of Warrington. Warrington did not seek out Mr. Hite and list block 10 with him as a broker. Although Warrington accepted the first offer, it was a generous one, resulting in a substantial gain on unimproved, undeveloped land held 8 years after it was determined to be unsuitable for use in Warrington's business. *264 Comparing the ratio of the proceeds of sale of block 10 to its cost with the same ratio derived from typical sales of lots with houses thereon in the ordinary course of Warrington's business, the former is so much greater than the latter, it smacks of speculation. There is little dispute about the underlying facts. The controversy centers around the inferences that can be drawn therefrom. In holding for the petitioners on this issue, we have not attempted herein to reconcile all of respondent's cases because it would be fruitless to attempt a case-by-case distinction in this prolific field. Thompson v. Commissioner,322 F.2d 122 (C.A. 5, 1963). Based on the entire record and for the reasons above-stated, we do not believe the profit realized by Warrington on the sale of block 10 represents "profits * * * arising from the everyday operation of a business." We believe the profit stemmed from a change in the character of the property because it was determined to be unsuitable for use in Warrington's business and represented "the realization of appreciation in value over a substantial period of time." *265 Malat v. Riddell,383 U.S. 569 (1966). Block 10 was not precluded from qualifying as a capital asset merely because its increase in value was due in part to Warrington's efforts in developing Wildewood subdivision. UnitedStates v. Winthrop,417 F.2d 905 (C.A. 5, 1969). Our conclusion is in accord with what we stated in Raymond Bauschard,31 T.C. 910 (1959), affd. 279 F.2d 115 (C.A. 6, 1960), to be the fundamental objective of the capital gain provisions; i.e., to grant preferential treatment to the gains realized from those transactions which are not the normal source of the taxpayer's business income. Maddux Construction Co.,54 T.C. 1278 (1970). The remaining issue involves deductibility by Warrington as a selling expense (which is actually deducted by petitioner as sole shareholder of Warrington, a qualifying subchapter S corporation) $ 1,500 paid to Mr. Larkin. Warrington paid him $ 300 per month for 5 months in 1967 during which time Mr. Larkin was Deputy Comptroller of the State of Florida. Mr. Larkin testified that he performed services for Mr. Dean in connection with a project *266 known as "Pensacola Village" and the money represented a salary or reimbursement of expenses. The record does not contain any evidence of the nature of "Pensacola Village" other than the testimony of Mr. Larkin and he did not testify that it was a project of Warrington. Petitioners offered no proof that Mr. Dean personally was involved in such a project, nor do petitioners contend that the payments are deductible by Mr. Dean personally. The audit report of Warrington does not reflect a project known as Pensacola Village. Thus, the entire record is insufficient to prove that petitioner is entitled to a deduction for payments totaling $ 1,500 to Mr. Larkin in 1967. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to sections of the Internal Revenue Code of 1954 in effect during the taxable years in issue, unless otherwise noted.↩
2. Hereafter, the property in issue will be referred to as block 10 solely as a matter of descriptive convenience. For reasons set out in the opinion, our examination of the entire record leads us to conclude that block 10 was in substance a remnant of the Bell property. It was nothing more than a parcel of unimproved, undeveloped real estate unsuitable for use in Warrington's business.↩
3. Although certainly not determinative of the issue, we do not view the sale of block 10 as a bulk sale of 14 undeveloped lots in a single transaction. The parties to the sale treated this land as a remnant or parcel and we do not think Warrington's failure to remove lot lines from the plat of Wildewood subdivision or its description of the land in issue on its income tax return as "14 lots in Wildwood [sic]" changes the substance of the sale. Even if the sale of block 10 were viewed as a bulk sale of 14 unimproved lots in a single transaction, we would reach the same result on this issue because this case is clearly distinguishable from Donald J. Lawrie,36 T.C. 1117↩ (1961). The petitioners herein have shown good reasons for not improving and developing block 10, and we have concluded that at the time of sale Warrington held block 10 as an investment.