**UNITED STATES of America,**
**Appellant,**

v.

**Ada Belle WINTHROP, Individually and**
**as Executrix under the will of Guy**
**L. Winthrop, Deceased, Appellee.**

**No. 26176.**

United States Court of Appeals
Fifth Circuit.

Oct. 22, 1969.

---

Clinton N. Ashmore, U. S. Atty., Tallahassee, Fla., Mitchell Rogovin, Asst. Atty. Gen., Meyer Rothwacks, William A. Friedlander, David E. Carmack, Stanley L. Ruby, Lee A. Jackson, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellant; Stewart J. Carrouth, Asst. U. S. Atty., of counsel.

W. J. Oven, Jr., Tallahassee, Fla., for appellee.

Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

We must emerge with a solution to the "old, familiar, recurring, vexing and ofttimes elusive" problem described by Judge Brown in Thompson v. Commissioner of Internal Revenue, 5 Cir.1963, 322 F.2d 122, concerning capital gains versus ordinary income arising out of the sale of subdivided real estate. Finding ourselves engulfed in a fog of decisions with gossamer like distinctions, and a quagmire of unworkable, unreliable, and often irrelevant tests, we take the route of ad hoc exploration to find ordinary income.

I.

The taxpayer, Guy L. Winthrop[1] was the owner of certain property in the environs of Tallahassee, Florida, known as Betton Hills. The property had been in his family since 1836. Winthrop first received a share of the property in 1932 upon the death of his mother. Additional portions of the property were received by him in 1946, 1948, and 1960 through inheritance and partition. As the city of Tallahassee expanded, its city limits were extended to incorporate most of the Winthrop property and the taxpayer began to sell lots for homesites. The first subdivision was undertaken in 1936, and the first sales were made in that year. Thereafter, eight other subdivisions were platted and developed by the taxpayer. Each subdivision was platted separately and the taxpayer endeavored to sell most of the lots in one subdivision before another was developed. The process was one of gradual orderly development of the property through the various subdivisions. Each was surveyed and platted. The streets were graded and paved at Winthrop's expense. Electricity and water facilities were installed; and in some subdivisions sewer lines were built, again at Winthrop's expense, although this was eventually repaid out of the utility bills incurred by homeowners who moved into the subdivisions. Moreover, the taxpayer participated in building five houses for sale in the addition in order to assist other purchasers in obtaining F.H.A. loans to finance their homes.

In selling the lots Winthrop neither advertised nor engaged brokers. The customers primarily came to his home to conduct the sale negotiations since he did not even have an office. He did however, purchase an annual occupational license as a real estate broker from the City of Tallahassee from 1948 through 1963. Despite this low pressure and informal selling technique, the parties stipulated that Winthrop was primarily engaged in selling the Betton Hills property and that though he was a

<hr />

1. Ada Belle Winthrop, individually, and as executrix under the will of Guy L. Winthrop, deceased, is the appellee in the instant case. The activities under review, however, concern Guy L. Winthrop and he will, therefore, be referred to as the taxpayer.

civil engineer by profession, he did little work of this type during the period in question save that done on the Betton Hills property. Furthermore, Winthrop's technique, although unorthodox, was apparently effective. Commencing with the year 1945 and ending in December, 1963, approximately 456 lots were sold in Betton Hills.[2] The profit and other income realized by Winthrop from the sale of these lots from 1951 through 1963 was $483,018.94 or 52.4% of his total income during that period.

The taxpayer reported the profits from these sales as capital gains up until 1953. In that year the Commissioner determined that Winthrop was liable for self employment taxes with respect to his real estate sales. His accountant thereafter listed the sales of Betton Hills property, and expenses connected with those sales, as profits from a business or profession and for the years 1953 through 1963 the taxpayer and his wife paid taxes on these profits at ordinary income rates. In addition, the taxpayer paid self employment taxes for these years on the income derived from the sale of Betton Hills real estate, and such a tax was paid for him in 1963 by his executrix. On his income tax returns for the years 1953 through 1962 the taxpayer listed his occupation as "real estate and engineer." He also list-

ed his occupation in a similar manner on motel registration cards during his extensive travels within the period in question.

After Mr. Winthrop's death in 1963, Mrs. Winthrop, individually and as executrix of Mr. Winthrop's estate, filed claims for a refund for the years 1959 through 1963 in the amount of $57,630.-96, asserting that the gains from the sale of the subdivided properties should have been treated as capital gains rather than ordinary income, as originally reported on the tax returns for those years. The Commissioner disallowed these claims and this suit followed. The court below agreed with Mrs. Winthrop's contention and ordered the refund. From this adverse judgment the government appeals. Agreeing with the government, we reverse the decision of the district court and hold that the profits received by the taxpayer from the sales of the property in question were ordinary income.

## II.

■ The government's first argument in support of its contention that the district court erred in granting capital gains treatment to the taxpayer is founded upon the proposition that capital gains treatment is available only

2. Transactions from 1945 through 1963:

| Year | Transactions | Total Lots Sold |
|------|-------------|-----------------|
| 1945 |             | 25              |
| 1946 | 64          | 84              |
| 1947 | 7           | 8½              |
| 1948 | 9           | 15              |
| 1949 | 14          | 21              |
| 1950 | 42          | 50              |
| 1951 | 25          | 26½             |
| 1952 | 17          | 19              |
| 1953 | 16          | 19½             |
| 1954 | 23          | 30              |
| 1955 | 25          | 26              |
| 1956 | 14          | 15              |
| 1957 | 17          | 24¼             |
| 1958 | 2           | 5               |
| 1959 | 5           | 7               |
| 1960 | 25          | 35              |
| 1961 | 9           | 10              |
| 1962 | 20          | 28              |
| 1963 | 7           | 7               |

where the appreciation in value is the result of external market changes occurring over a period of time. In other words, the government argues that where the appreciation is due to the taxpayer's efforts, all profit should be reported as ordinary income. In statutory terms the government argues that the subdivided land ceased to be a "capital asset" when the taxpayer improved the land through his own efforts by platting the lots, paving streets, and installing utilities. Although recognizing that subdivided land is not expressly removed from the "capital asset" category by the exclusionary provisions of I.R.C. § 1221[3] unless such land is held primarily for sale to customers in the ordinary course of business, the government, nevertheless, maintains that its taxpayer efforts rule has, in effect, been read into the statute by the courts. In support of this argument the government relies principally on the following language from Corn Products Refining Co. v. Commissioner of Internal Revenue, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29:

"Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. at page 106, 53 S.Ct. at page 75." Id. at 52, 76 S.Ct. at 24.

We think the preceding language from *Corn Products* fails to support the taxpayer efforts rule advanced by the government. The case does support the proposition that an asset may not be a capital asset for tax purposes even though not expressly excluded from that status by I.R.C. § 1221, but the opinion neither mentions nor deals with assets improved by the taxpayer's effort. Rather, it dealt with daily operational profits in the ordinary course of the taxpayer's business. Further, the other cases discussed in the government's brief in support of this novel interpretation of *Corn Products* do not adopt the taxpayer efforts rule. In Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 1960, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617, the court held that the fair rental value of facilities taken over temporarily by the gov-

---

3. 26 U.S.C.A. Internal Revenue Code § 1221
Capital asset defined
For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;
(3) a copyright, a literary, musical, or artistic composition, or similar property, held by—

(A) a taxpayer whose personal efforts created such property, or
(B) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property;
(4) accounts or notes receivable acquired in the ordinary course of trade or business for service rendered or from the sale of property described in paragraph (1); or
(5) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.

ernment was ordinary income. In United States v. Midland-Ross Corp., 381 U.S. 54, 85 S.Ct. 1308, 14 L.Ed.2d 214, also relied on by the government, the gain on the sale of non-interest bearing notes purchased at a discount was held to be ordinary income. In neither case did the court have before it property which had been improved by the taxpayer's effort. In both cases what was really sold was the right to receive income, one in the form of rentals, the other in the form of interest. The lump sum payments were, therefore, held to be ordinary income to the recipient. These decisions hardly support the government's argument that Betton Hills was not a capital asset merely because its increase in value was due in part to the taxpayer's efforts.

If the universality and sweep which the government reads into the *Corn Products* message is in fact the gospel word in capital gains cases, it has not yet come through nor been heard by the Fifth Circuit. Indeed, the cases are many where taxpayer efforts have contributed to value and have been accorded capital gains treatment. United States v. Temple, 5 Cir.1966, 355 F.2d 67; Commissioner of Internal Revenue v. Ponchartrain Park Homes, Inc., 5 Cir. 1965, 349 F.2d 416; Cole v. Usry, 5 Cir. 1961, 294 F.2d 426; Barrios' Estate v. Commissioner of Internal Revenue, 5 Cir.1959, 265 F.2d 517; Smith v. Dunn, 5 Cir.1955, 224 F.2d 353; Goldberg v. Commissioner of Internal Revenue, 5 Cir.1955, 223 F.2d 709. As this court said in *Barrios' Estate, supra:*

"The idea of selling a large tract of land in lots embraces necessarily the construction of streets for access to them, the provision of drainage and the furnishing of access to such a necessity as water. It is hardly conceivable that taxpayer could have sold a lot without doing these things. To contend that reasonable expenditures and efforts, in such necessary undertakings are not entitled to capital gains treatment is to reject entirely the established principle that a person

holding lands under such circumstances may subdivide it for advantageous sale." 265 F.2d at 520.

We therefore conclude that this blanket interdiction of capital gains treatment where there has been any laying on of hands is belied by the past decisions of this court.

## III.

While we are in disagreement with the government's first argument concerning taxpayer efforts, we find its second argument, that the land in question was primarily held for sale in the ordinary course of business and, therefore, was not a capital asset under § 1221, persuasive. In holding against the government on this point the court below appears to have placed particular emphasis upon the following facts: (1) The proceeds from the sales of the property were not reinvested in real estate; (2) the taxpayer had other investments, none of which involved the sale of real estate; (3) the subdivided property was acquired by inheritance, not by purchase for the purpose of resale; (4) the taxpayer's holding period was twenty-five years; (5) the taxpayer maintained no office, made most of the sales from his home, spent no time whatever promoting sales and did not advertise; and (6) the purchasers came to him and he was selective in making the sales.

In relying on these factors the court below was obviously following earlier suggestions by this court that such facts are relevant in determining the ultimate question of whether or not the land in question was held primarly for sale to customers in the ordinary course of business. Cole v. Usry, 5 Cir.1961, 294 F.2d 426; Barrios' Estate v. Commissioner of Internal Revenue, 5 Cir.1959, 265 F.2d 517; Consolidated Naval Stores Co. v. Fahs, 5 Cir.1955, 227 F.2d 923; Smith v. Dunn, 5 Cir.1955, 224 F.2d 353; Ross v. Commissioner of Internal Revenue, 5 Cir.1955, 227 F.2d 265; Goldberg v. Commissioner of Internal Revenue, 5 Cir.1955, 223 F.2d 709. In condensed form the tests mentioned

most often are: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. Smith v. Dunn, *supra*, 224 F. 2d at 356.

Despite their frequent use, this court has often declared that these seven pillars of capital gains treatment "in and of themselves * * * have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety to determine whether or not the property involved was held primarily for sale in the ordinary course of business (source cited)." Cole v. Usry, *supra*, 294 F.2d at 427. Accord: Thompson v. Commissioner of Internal Revenue, 5 Cir.1963, 322 F.2d 122; Wood v. Commissioner of Internal Revenue, 5 Cir.1960, 276 F.2d 586; Thomas v. Commissioner of Internal Revenue, 5 Cir.1958, 254 F.2d 233; Smith v. Commissioner of Internal Revenue, 5 Cir. 1956, 232 F.2d 142; Consolidated Naval Stores Co. v. Fahs, 5 Cir.1955, 227 F.2d 923. Moreover, in Thompson v. Commissioner, *supra*, this court remarked concerning these "tests":

> "Essential as they are in the adjudication of cases, we must take guard lest we be so carried away by the proliferation of tests that we forget that the statute excludes from capital assets 'property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.' 26 U.S.C.A. § 1221. * * *"
> 322 F.2d 127.

In the instant case the trial court found that these test facts, about which there is no disagreement, compelled a finding of the ultimate fact that the holding was not primarily for sale in the ordinary course of the taxpayer's business. In weighing the arguments on this point this court recognizes that the characterization of the taxpayer's manner of holding lands is a question of fact. The district court's finding on this ultimate issue, however, is not to be garrisoned by the clearly erroneous rule. Though it has factual underpinnings this ultimate issue is inherently a question of law. Obeisance to the clearly erroneous rule must yield when the facts are undisputed and we are called upon to reason and interpret. This is the law obligation of the court as distinguished from its fact finding duties. In Thomas v. Commissioner, *supra*, the court clearly states our role in determining whether capital gains or ordinary income treatment is to be accorded the proceeds received from the sale of lots in a subdivision:

> "In the case before us there is no basic disagreement as to the evidentiary facts. In such situation, as has been said on several occasions, if the conclusion of the trial court as to the ultimate fact is merely, as here, a product of legal reasoning, that conclusion is subject to appellate review free from the restraint of the clearly erroneous rule. Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709; Consolidated Naval Stores Co. v. Fahs, supra; Smith v. Commissioner, supra; Fahs v. Taylor, 5 Cir., 1956, 239 F.2d 224; Gamble v. Commissioner, [5 Cir., 242 F.2d 586] supra." 254 F.2d at 236.

We think, therefore, that even though we accept as true the fact findings of the court below, it is nevertheless incumbent upon this court to inquire into the ultimate conclusion of law reached by that court. In so doing, our analysis of the undisputed facts leads us to the contrary conclusion, that the taxpayer did hold the land in question primarily for sale to customers in the ordi-

nary course of business, and thus, under I.R.C. § 1221 is not eligible for capital gains treatment on the profits made from the sale of this land.

In analyzing a case of this sort no rubrics of decision or rubbings from the philosopher's stone separate the sellers garlanded with capital gains from those beflowered in the garden of ordinary income. Each case and its facts must be compared with the mandate of the statute. In so doing we note that the enunciations of the Supreme Court are clarion as they enjoin us to construe narrowly the definition of a capital asset and as a corollary interpret its definitional exclusions broadly. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L. Ed. 199; Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168; Kieselbach v. Commissioner of Internal Revenue, 317 U.S. 399, 63 S.Ct. 303, 87 L.Ed. 358; Commissioner of Internal Revenue v. P. G. Lake, 356 U.S. 260, 78 S.Ct. 691, 2 L. Ed.2d 743. We therefore approach first the issue of whether or not Winthrop held the property "primarily for sale" as that phrase is used in § 1221.

It is undisputed that Winthrop inherited the first portion of the Betton Hills land in 1932. By 1936 the first sales had been made and further subdivisions were under way. Mrs. Winthrop's testimony indicates that, except for the subdividing and selling, the land was not used by the taxpayer. According to her, a city employee was allowed to live there, but this was rent free. Later, another city employee rented a small house for $40.00 a month but "not the land." Rather they "granted him the right to plant some corn." On the other hand, her testimony was equally clear in showing that the taxpayer's activities regarding the land, such as paving the streets and having utilities installed, were done with the express purpose of making it more saleable. She testified that he built houses on some of the lots in order to make FHA financing available to prospective purchasers of other lots. Moreover, she built some houses on the lots because "if a person built a house and there was a house nearby, somebody wanted the lot, because people like neighbors."

There were, therefore, no multiple, dual, or changes of purpose during the relevant years of Winthrop's Betton Hills sales. The taxpayer, long before the tax years in question, had as his sole motivation the sale of Betton Hills, lot by lot, year by year, transaction by transaction. The evidence is clear and uncontradicted that the lots were at all times held by Winthrop "primarily for sale" as that phrase was interpreted by the Supreme Court in Malat v. Riddell, 1966, 383 U.S. 569, 86 S.Ct. 1030, 16 L. Ed.2d 102.

Holding primarily for sale, however, is by itself insufficient to disqualify the taxpayer from capital gains privileges. The sales must also be made in the ordinary course of the taxpayer's trade or business. The next issue, therefore, is whether the taxpayer's activities constituted a trade or business. We think that they did. The magnitude and continuity of his operations and design all point to these sales being part of a business. This was a planned program of subdividing and selling, lasting over a quarter of a century. It constituted Winthrop's principal activity and produced over one-half of his income during the years in question. This was no minuscule operation in terms of transactions or profits. Unlike the sellers in Smith v. Dunn, *supra*, the taxpayer here devoted a substantial amount of his time, skill and financial resources to developing and selling the property. He thereby became engaged in the business of subdividing real estate for sale. One need not be a static holder to qualify for capital gains treatment, but the flexing of commercial muscles with frequency and continuity, design and effect does result in disqualification because it indicates one has entered the business of real estate sales. Thompson v. Commissioner, 5 Cir.1963, 322 F.2d 122; Galena Oaks Corp. v. Scofield, 5 Cir.1954, 218 F.2d 217.

**912**

The taxpayer has made much over the fact that no office was used, no brokers were employed, no time was spent promoting sales, and no advertising was used. While advertising, solicitation and staff are the usual components of a business, they are not a necessary element in either the concept or the pragmatics of selling. Here it is evident that the taxpayer was quite successful in selling the lots without the assistance of these usual props. It is not necessary that customers be actively and fervently and frenetically sought. Winthrop had lots to sell and not mousetraps, so they beat a way to his door to buy his lots. As the court remarked in Thompson v. Commissioner, *supra*, which involved a similar lack of promotional activity, "merely because business was good, indeed brisk, does not make it any less in the ordinary course of such a good business." 322 F.2d at 124. Winthrop was in the business of selling lots in Betton Hills, even though his salesmanship was unorthodox and low pressure. The sales were out of his lots, and were made to customers, though these customers sought him out rather than having been pursued.

In addition, we think the sales were ordinary in the course of this business. The concept of normalcy requires for its application a chronology and a history to determine if the sales of lots to customers were the usual or a departure from the norm. History and chronology here combine to demonstrate that Winthrop did not sell his lots as an abnormal or unexpected event. He began selling shortly after he acquired the land; he never used the land for any other purpose; and he continued this course of conduct over a number of years. Thus, the sales were not only ordinary, they were the sole object of Winthrop's business. It is this singleness of purpose which distinguishes Winthrop's sales from those in *Barrios' Estate, supra, Consolidated Naval Stores, supra, Ross, supra*, and *Goldberg, supra*, all relied on by the taxpayer. It is true, as the taxpayer asserts, that in each of

these cases there was considerable sales activity. However, in each the property had been used for some other purpose and the sales ensued only when this primary purpose was abandoned. Here there was no change of purpose.

Winthrop's subdividing was not adventitious, but on the contrary was consistently advertent. While Winthrop probably would not have qualified as the salesman of the year in any of the years in controversy in Tallahassee and its environs, the sales were routine and ordinary, not a result of an abandoned activity on the land. Sale was the prime purpose of the holding and the sales were made in the ordinary course of the taxpayer's business. We conclude, therefore, that the taxpayer is not entitled to capital gains treatment on the profit made from the sales of land during the years 1959 through 1963. The judgment of the district court is

Reversed.