PASADENA GOLF COURSE, INC., and HOLLINS CORPORATION, Petitioners v. COMMISSIONER OF INTERNAL REVENUE
Pasadena Golf Course, Inc. v. Commissioner
Docket No. 5682-73
United States Tax Court
T.C. Memo 1975-237; 1975 Tax Ct. Memo LEXIS 135; 34 T.C.M. (CCH) 1025; T.C.M. (RIA) 750237; July 17, 1975, Filed Orrin M. Gowen and Joel D. Bronstein, for the petitioners. Donald W. Williamson, Jr., for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: The respondent determined deficiencies in petitioner's federal income tax for the fiscal years ended August 31, 1969 and August 31, 1970 in the amounts of $51,541.25 and $32,773.68, respectively. The sole issue in controversy is whether the gain realized from the sale of land held by the petitioner should be characterized as ordinary income or capital gain. To settle this issue we must determine whether the land in question was acquired and held by the petitioner primarily for sale to customers in the ordinary course of its business, or was acquired and held for investment and/or other purposes. FINDINGS OF FACT Some of the *136 facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Pasadena Golf Course, Inc. and Hollins Corporation are corporations organized and existing under the laws of Florida with their principal places of business in St. Petersburg, Florida when their petition was filed herein. Pasadena Golf Course, Inc. filed its corporation income tax returns for the taxable years ended August 31, 1969 and 1970 with the district director of internal revenue for the district of Florida. Hollins Corporation is a party to this proceeding because Pasadena Golf Course, Inc., chartered in 1934, was merged into Hollins Corporation on September 30, 1971. On October 1, 1971, Hollins Corporation chartered a new Florida corporation also known as Pasadena Golf Course, Inc., to hold title to the lands formerly owned by the predecessor corporation of the same name. However, since this merger and subsequent events occurred after the taxable years in question, the predecessor corporation, Pasadena Golf Course, Inc. will be referred to as the petitioner. The petitioner was incorporated in 1934 for the purpose *137 of operating a golf course in St. Petersburg, Florida. Petitioner was also authorized to "deal in * * * to develop and improve real estate * * * of any kind whatsoever." Petitioner's original officers were Dixie M. Hollins (hereinafter Hollins, Sr.) and his son Maurice L. Hollins (hereinafter Hollins, Jr.) who served as president and vice-president, respectively. In 1962 Hollins, Sr. passed away and Hollins, Jr. became president of petitioner as well as the president of the St. Petersburg Printing Company and Harbond, Inc., two other separate businesses operated by the Hollins family. The petitioner operated the golf course until November, 1945, when the course and clubhouse were leased to the City of St. Petersburg for operation as a municipal course. The city operated the course for the benefit of the public until June, 1954, when the properties were leased to and operated by Premier Development Corporation. This lease was terminated on November 30, 1968. Since December 1, 1968, the golf course and clubhouse have been operated by the taxpayer and its successor for their own account. Except in the fiscal year ended August 31, 1969, when the net profit was less than $20,000, petitioner *138 never realized a net profit from its golf course operations. During this period petitioner did realize gross income from sources other than from the disputed sales of land. Adjoining petitioner's golf course property was land that was submerged under approximately 1-4 feet of water. This property, located in what is commonly known as Boca Ciega Bay, was acquired in July, 1954 by petitioner in a single purchase from Gerald G. and Gladys Mathews and others (hereinafter the Mathews group). The purchase price was $22,500 for approximately 275 acres. The Mathews group also owned submerged land adjoining the portion sold and in a boundary line agreement the parties agreed that neither would object to any plans by the other party to improve their respective properties. After the acquisition petitioner developed plans to dredge, fill, and bulkhead the property to create additional waterfront property. Such property, improved or unimproved, along the entire west coast of Florida appreciated in value during the period between 1954 and 1970. In 1956, petitioner filed three applications with the Pinellas County Water and Navigation Control Authority and the U.S. Corps of Engineers for the *139 purpose of obtaining permits to effectuate its plans. These permits were approved in due course. During this period it was becoming increasingly difficult to obtain such permits and by 1960 it was virtually impossible to obtain such permits due to environmental considerations. This project commenced in 1956 and was completed in 1959. Petitioner incurred expenses of $332,000 for dredging and filling and $360,000 for the seawall bulkhead. This property (hereinafter the filled land) is subject to wave and tidal action and the construction of the seawall was the only effective method of preventing the erosion of the land. As of September 1, 1968, the total cost attributable to the project was $823,956.48. Petitioner incurred debt to finance the cost. Because of these large expenses incurred and the modest amount of income generated by its golf course activities, petitioner realized that portions of the filled land would have to be sold. The first sale was made in 1957 and a second in 1958, raising a total of approximately $541,000. A third sale (hereinafter the Hollins, Sr. sale) also occurred in 1958. Petitioner was indebted to Hollins, Sr. who had advanced money to it over a period *140 of time. To repay Hollins, Sr. petitioner first improved a section of the filled land by putting in streets, water, and drainage and then in July, 1958 conveyed this section to Hollins, Sr. who platted it and in his individual capacity sold lots. Other than the improvements made in this section and the dredging, filling, and seawalling petitioner has made no significant improvements on the filled land. Petitioner elected to report the Hollins, Sr. sale on the installment basis. The profit percentage was determined to be 58.29 percent. As of August 31, 1968, payments of $754,289.96 had been made on the sales price of $800,000. An additional payment of $25,000 was made in the fiscal year ended August 31, 1969. Petitioner reported $14,572.50 as long-term capital gain on its tax return for that fiscal year. No payments were made in the fiscal year ended August 31, 1970. In 1961 petitioner listed the remaining portions of the filled land for sale on a multiple listing service in St. Petersburg. No sales resulted from this listing primarily because the asking price of $12,000 per acre was too high. Petitioner did receive offers to sell this property. All but two, which resulted in relatively *141 small sales in 1962 and 1963, were refused because the prospective buyers could not meet the high cash down payment and 5-6 year period payment schedule requirements. In late 1965 Hollins, Jr. became ill. Throughout 1966 he visited several doctors, and finally in October, 1966 he entered the Mayo Clinic for examination. A lump in his throat was found and, after an exploratory operation in March, 1967, the diagnosis was cancer of the thyroid. Hollins, Jr. then visited George Crile, Jr., M.D. in April, 1967, who advised him that, with proper medication, suppression of the disease was possible and that, if it lasted for a year, he could expect a normal life span. During this period Hollins, Jr. was concered with his health and he wished to set his business interests in order. In June, 1966 he signed an arrangement with Al Werly and Elder & Powell, Inc. (hereinafter Elder & Powell), real estate brokers, giving them the exclusive right to sell the filled land for 2 months. This arrangement was formally extended through most of 1966. There was considerable activity with respect to this listing including national advertising, brochures, and correspondence to prospective buyers. In April, *142 1968 this exclusive listing was formally ended when Hollins, Jr. informed Elder & Powell that this property was no longer for sale. As a result of Elder & Powell's efforts one sale was consummated covering two parcels and an option taken on a third. The two parcels were sold in November, 1967 and were reported as completed sales on petitioner's tax return for the fiscal year ended August 31, 1968. [1]
The option on the third parcel was exercised in November, 1968. Petitioner elected to report this sale (hereinafter the Green sale) on the installment basis. The profit percentage was determined to be 55.9 percent. Collections were made on this sale in the fiscal years ended August 31, 1969 and 1970 in the amounts of $80,000 and $110,000, respectively. Petitioner on its tax returns for those years reported $44,720 and $61,490, respectively, as long-term capital gain. In November, 1968 petitioner entered into an option agreement for the sale of certain other parcels of property with the option expiring in April, 1974. *143 In March, 1969 the options on two parcels were exercised. This sale (hereinafter Tract V and W sale) was reported as a completed transaction. The sales price was $267,065.17, the cost basis claimed was $120,948.49, resulting in a profit of $146,116.68. This amount was reported by petitioner on its tax return for the fiscal year August 31, 1969 as long-term capital gain. In April, 1970 the option on one-half of another parcel was exercised. This sale (hereinafter Tract U sale) was also reported as a completed transaction. The sales price was $159,450. The cost basis claimed was $54,787.47, resulting in a profit of $104,662.53. This amount was reported by petitioner on its tax return for the fiscal year ended August 31, 1970 as long-term capital gain. Petitioner in total has entered into eight contracts of sale with respect to the filled land. Petitioner, as of the trial date, still owned the remaining portion of the filled land, which amounts to approximately 70 percent of the original acreage. During the period 1953 through 1956, petitioner sold three tracts of land for approximately $45,000 each, which was apparently land acquired by the petitioner when it was incorporated. *144 Petitioner reported a net long-term capital gain of $203,721.68 and $165,130.57 attributable to sales of this property on its tax returns for the fiscal years ended August 31, 1969 and 1970, respectively. [2] In his deficiency notice respondent determined as follows: It is determined that the sales of land reported by you in the tax years ended August 31, 1969, and August 31, 1970, constitute sales of property held by you for sale to customers in the ordinary course of your trade or business. Therefore, the gains realized from such land sales in the amounts of $203,721.68 and $165,130.57 for the tax years ended August 31, 1969 and August 31, 1970, respectively, are taxable as ordinary income rather than long-term capital gains as reported on your income tax returns. Accordingly, your ordinary taxable income is increased in the tax years ended August 31, 1969 and August 31, 1970 in the amounts of $203,721.68 and $165,130.57, respectively; and your taxable long-term capital gains are decreased in the tax years ended August 31, 1969 and August 31, 1970 in the amounts of $203,721.68 and $165,130.57, respectively. *145 OPINION The case at bar presents for our determination the oft-litigated issue of whether real property owned by the petitioner was held "primarily for sale to customers in the ordinary course of [its] trade or business" within the meaning of section 1221(1), I.R.C. of 1954, [3] with the result that gain upon its sale is to be treated as ordinary income rather than capital gain. This issue is purely factual, its resolution depending on the unique combination of its particular facts. To help place this issue in perspective several factors have been established as particularly relevant. Those considered most often are: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer *146 over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. United States v. Winthrop,417 F. 2d 905, 910 (5th Cir. 1969). However these factors have no independent significance and only form part of the entire situation presented. United States v. Winthrop,supra at 910. After settling on the factual determinations, we must apply them to the relevant statute. We must do so reflecting the fact that the capital gains provisions, which provide an exception to the normal tax rates, are to be construed narrowly, Corn Products Refining Co. v. Commissioner,350 U.S. 46, 52 (1955), and that the burden of proof is on the petitioner, S. O. Bynum,46 T.C. 295, 298 (1966). Section 1221 defines the term "capital asset" as being property (with five statutory exceptions) held by the taxpayer. The first statutory exception, as found in section 1221(1), excludes from the definition of property: (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable *147 year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *. The purpose of this exception, as stated by the Supreme Court's opinion in Malat v. Riddell,383 U.S. 569, 572 (1966), is to differentiate between gain derived from the everyday operations of a business and gain derived from assets that have appreciated in value over a substantial period of time. The Court went on to hold that, as used in section 1221(1), "primarily" means "of first importance" or "principally," Malat,supra at 572. This statutory exception had previously been clarified in Dunlap v. Oldham Lumber Co.,178 F. 2d 781, 785 (5th Cir. 1950)when the Court noted that the property must not only have been "held primarily for sale," but also for sale in the "ordinary course of business." See also Winthrop,supra at 911 and William B. Howell,57 T.C. 546, 555 (1972). Petitioner argues that the filled land was not acquired primarily for sale citing several other reasons for the acquisition of the property. Hollins, Jr., petitioner's president, testified that *148 the acquisition was made for possible golf course expansion, to protect the golf course property from detrimental development of adjoining land, to insure proper drainage, and for investment purposes. However, we do not believe that the evidence in the record supports a finding that the acquisition was made primarily for any of the first three reasons. Petitioner did not produce any corroborating evidence to support the testimony that plans to enlarge the golf course were considered. It does not appear that these plans were strongly pursued or that this was the motivating reason for the acquisition. The record also includes the testimony of the county engineer who was responsible for approving dredge and fill permits between 1955 and 1960. He indicated that the upland owner's rights (petitioner and its golf course property) would have been considered before approval would have been granted a third person to dredge and fill the adjoining land. He concluded that it would have been unlikely that a third person would have secured approval of such an application. We also note that, in the boundary agreement between petitioner and the Mathews group, each agreed not to object to any *149 prospective development plans of the other. Petitioner then was not entirely protected against what it thought would be detrimental development of adjoining property. The engineer also testified that it was not necessary to dredge, fill, and seawall the property to assure the golf course property of proper drainage. These factors are important considering that petitioner could have had the same degree of protection against adjoining development and assured proper drainage for its property for $22,500, the cost of the submerged land; yet petitioner was willing to spend approximately $1,000,000 to dredge, fill and seawall the land. Certainly this property was acquired for the purpose of creating usable land for eventual resale, hopefully at a profit; however that leaves for determination whether this property was held for sale in the ordinary course of petitioner's business. Respondent's view is based upon petitioner's acquisition of the property, its activities with respect to its development, and the selling effort that produced several transactions and large profits. Petitioner points to the small number of sales and the nontrade or business reasons for them, its lack of significant *150 development of the property, and the fact that it still owns a majority of the filled land. Although petitioner was authorized to deal in and develop real estate in its articles of incorporation, there is no indication in the record that this authority was used until the submerged land was acquired. The mere existence of the power without a corresponding volume and continuity of activity is not enough to demonstrate that it is being actively exercised. South Texas Properties Co.,16 T.C. 1003, 1009 (1951). With the acquisition of this property, petitioner did develop plans to dredge, fill, and seawall the property. The necessary permits were acquired and the project was completed by 1960. Respondent believes that this activity represents tangible evidence of petitioner's intent to enter the real estate business. We do not believe that property loses its capital asset status merely because the taxpayer has improved his property through his own efforts. Such activity does not always produce profit derived from the everyday operation of a business. There are many cases where taxpayer efforts have contributed to value and the gain realized has been accorded capital *151 gains treatment. United States v. Winthrop,supra at 908-909. While the land fill project was in progress it became obvious that portions of the land would have to be sold to finance it. The record is clear that petitioner did not realize much income from its golf course operation and that the land fill project was costly. Some portions of the filled land were sold and the property was listed for sale in 1961. When the property was listed for sale petitioner required a high cash down payment and a relatively short payment schedule for the balance. Petitioner refused other offers that could not meet these terms. We believe that such activity at this time is consistent with petitioner's need for funds and its desire to retain as much of the property as possible. During this period petitioner conveyed a portion of the property to Hollins, Sr. to repay amounts owed by petitioner to him. Petitioner improved this parcel by installing streets, water, and drainage. Although it is not clear whether such improvements were made before or in connection with this sale, petitioner never made any improvements (other than the original land fill project) to any of the other *152 portions of the land. We believe the activity in this instance is an individual event and does not indicate a general intent to enter into the everyday operations of a real estate business. Our discussion infra with respect to the land fill project is also applicable. In 1966 the property was again listed for sale. There was considerable activity in connection with this listing which resulted in the sale of two parcels and an option on a third which was exercised (the Green sale) during the first fiscal year in issue. In April, 1968 the listing arrangement was terminated. Later in 1968 another option was negotiated which resulted in the Tract V, W, and U sales in issue. The sales activity, including that engaged in by petitioner itself, during this period coincides with the problems Hollins, Jr. was having with his health. He was concerned with the disposition of his business interests and the problems presented by a large estate that consisted of valuable nonliquid assets. In late 1966 his illness was diagnosed as throat cancer. In April, 1967 he was told that if he lived for a year, suppression of the cancer was likely and he could expect a normal life span. The termination *153 of the listing agreement in April, 1968 coincides with the end of the 1 year waiting period. We believe that the sales activity during this period and the resulting sales are attributable to a reasonable nontrade or nonbusiness reason. Respondent points out that petitioner's largest source of income was from these sales and argues that this indicates petitioner was in the real estate business. This point was considered in United States v. Winthrop,supra at 911, and there the court found that "the flexing of commercial muscles with frequency and continuity, design and effect does result in disqualification because it indicates one has entered the business of real estate sales." We do not believe that the factual pattern of this case supports a finding in line with the above statement. Furthermore, large profits may indicate that the property was not held for resale in the day-to-day operation of a business. Scheuber v. Commissioner,371 F. 2d 996, 999 (7th Cir. 1967) reversing a Memorandum Opinion of this Court. Respondent admits that over the years there have been relatively few sales, but argues that because of the high asking price and *154 a slow real estate market the quantity of prospective purchasers was limited. Petitioner acquired the property in 1954 and by 1960 the land fill project was completed. As of the trial date petitioner still owned a majority of the land. We have also found that the sales activity that did occur was initiated for reasonable nontrade or nonbusiness reasons. Furthermore, we note that there is no indication that the proceeds realized from these were reinvested in other real estate investments. Much of petitioner's case rests upon the testimony of its president, Hollins, Jr. Respondent argues that parts of this testimony are in conflict with statements and documents supplied to respondent during the course of his audit. Such inconsistencies do exist, and we do not find his testimony at all times credible. However, parts of his testimony are corroborated through independent evidence in the record which forms the basis for our ultimate determination. After careful consideration of several factors and their relationship to the total factual pattern in this closely contested controversy, we find as an ultimate fact that petitioner was not engaged in the real estate business. Consequently, *155 we hold that the filled land was not primarily held for sale to customers in the ordinary course of petitioner's trade or business. In view of this finding, the gain produced by the disputed sales is held to have resulted in the realization of capital gain. Decision will be entered for the Petitioner.
Footnotes
1. In September, 1967 petitioner also sold a small portion of the property. However, this sale does not appear to be connected with the efforts of Elder & Powell.↩
2. ↩
8/31/69
8/31/70
Hollins, Sr. sale
$ 14,572.50 $
Green sale
44,720.00
61,490.00
Tract V and W sale
146,116.68
Tract U sale
104,662.53
205,409.18
166,152.53
Less: Expenses
1,687.50
1,021.96
Total
$203,721.68
$165,130.57
3. All statutory references are to the Internal Revenue Code of 1954, as amended.↩