CHARLES V. SPENCER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Spencer v. Comm'r
Docket No. 4719-78. United States Tax Court
T.C. Memo 1980-126; 1980 Tax Ct. Memo LEXIS 454; 40 T.C.M. (CCH) 187; T.C.M. (RIA) 80126; April 21, 1980, Filed Allison L. Maynard, for the petitioner. Robert A. Johnson, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies in income taxes and additions thereto as follows: Additions to Tax Year
Deficiency § 6651(a) [1] § 6653(a) § 6654
1971
$22,329.89
$ 5,582.47
$1,116.49
$ 714.55
1972
18,926.92
4,731.73
946.35
605.67
1973
40,169.44
10,042.36
2,008.47
1,285.42
1974
99,122.52
24,780.63
4,956.12
3,171.92
1975
3,283.58
820.89
164.18
154.82
*456 Petitioner failed to file income tax returns for the years in question and respondent reconstructed petitioner's income. It has been stipulated that petitioner had no tax deficiency for the years 1971 and 1975. There remain for our consideration the following issues: 1. Did petitioner receive gross ordinary income from his marine salvage business for the years 1972 through 1974 in amounts determined by respondent? 2. Has petitioner established that his business expenses or other expenses were in excess of the amount determined by the Commissioner? 3. Has petitioner established that he was entitled to a casualty loss deduction in the year 1972 for the sinking of his boat, the "Turtle"? 4. Is petitioner liable for the addition to tax provided by section 6651(a) for failure to file timely individual income tax returns for the years 1972, 1973 and 1974? 5. Is petitioner liable for the addition to tax provided by section 6653(a) for negligently maintaining books and records for the years 1972, 1973 and 1974? 6. Is petitioner liable for *457 the addition to tax provided by section 6654 for failure to pay estimated tax for the years 1972, 1973 and 1974? FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached are incorporated by this reference. Petitioner resided in Virginia on the day the petition was filed.
Petitioner grew up in West Virginia. Although his formal education went only as far as the sixth grade, petitioner is astute, intelligent and well read. Petitioner is a paraplegic and has been since about 1960 when he was injured in an accident at work. He spends most of his time in bed in a finished-off garage attached to his house. Despite this handicap, petitioner is, and was during the years in issue, in the marine salvage business. He uses the trade name "Marine Salvage Company" at least part of the time and he is considered an expert in the business. Petitioner started in this business several years before he was injured. After he was injured he felt that he had two choices: he could become a ward of the State and let his family survive on its own or he could continue in the marine salvage business and keep the *458 family together. Petitioner chose the latter course and he succeeded well enough over the years to keep his family together, maintain his home and educate his children. Petitioner feels that there are many marine salvage jobs that are unavailable to him, partially because of his handicap and partially because he is unable to afford proper bonding and cannot easily borrow money. He compensates by working on a "no cure -- no pay" basis; that is, if he fails in a salvage effort, he does not get paid. During the years in issue petitioner realized gross receipts from the following sources in the following amounts: Source
1972
1973
1974
Weeks Dredging
$40,045.00
$ 6,412.33
Hunt Contracting
13,450.00
Northhampton Trading Co.
1,900.00
"Unknown" and Nina Crockett
4,000.00
Sadler Materials
40,000.00
$ 10,000.00
Lone Star Industries
8,000.00
Davis Grain
13,720.00
Bay Towing
25,000.00
Blaha Towing Service
8,000.00
Chesapeake Corp. of Va.
16,500.00
York River Contracting Corp.
1,500.00
Powell & Purcell Co., Inc.
1,541.00
Hanks Seafood Co.
414.40
Houseboat
1,200.00
Craig Brothers
60,000.00
Moon Shipbuilding
35,000.00
Allied Chemical
48,500.00
Everett Haywood
25,000.00
Prudential Gracelines
30,000.00
Total
$59,395.00
$122,287.73
$208,500.00
*459 Most of these items were stipulated. In 1973 petitioner salvaged the tugboat "Bay King" off the coast of Delaware and he received the newly raised boat as compensation. Petitioner worked on the boat for a period of time and then sold it to Sadler Materials Corporation for $50,000. Forty thousand dollars was paid by check dated May 24, 1973, and $10,000 by check dated April, 1974. In 1973 petitioner received $16,500 from the Chesapeake Corporation for salvaging a barge and pile driving unit. To limit the Chesapeake Corporationhs liability for damages, petitioner purchased the boat on the bottom of the day for $3,000. Petitioner did not return the boat to the Chesapeake Corporation after it was raised. During the years in issue petitioner did not keep adequate records reflecting income and expenses. The records he kept were totally disorganized and were not kept in any routine manner. Petitioner did not have a personal checking account. At trial he submitted groups of checks totalling $43,247.77, $58,274.48 and $106,318.85 which he claimed represented business expenses for the years 1972 through 1974, respectively.
Petitioner did not share profits on the jobs with *460 Ronald Stone and James Honeycutt until 1974. Casualty Loss
On October 25, 1962, petitioner purchased the ferryboat "Turtle" for $7,500 for use in his operations. The advantage the Turtle had over other boats was that petitioner was able to get aboard and inside the Turtle; his wheelchair would not fit inside many other boats. The Turtle had previously been used to transport priests between islands in New York Harbor so it was ill-equipped for salvage operations. Petitioner transformed it into a salvage vessel by installing an A-frame and equipping it with such things as winches, pumps, air compressors, tools, a bunk room and a kitchen. These improvements were effected with secondhand materials and equipment, the cost of which and the years in which made are not known. On September 6, 1971, the boom of a wreck being pulled up by the Turtle came up under the Turtle, punching a hold in its bottom, and the Turtle sank. Petitioner had insured the Turtle for $30,000 but the insurance company originally refused to pay the claim. They contended that the Trutle was outside the three-mile limit at the time of the accident, and therefore not insured. Ultimately, the insurance *461 company settled the claim for $9,000, $3,000 of which went for attorney's fees. The year the insurance company settled the claim is not clear. Prior to settling the claim petitioner prepared a list of the improvements for consideration by the insurance company. He priced the equipment by contacting people and soliciting their opinions as to what the going rate was fr a particular used item. At trial he used these prices in an attempt to establish his basis in the property. Petitioner filed no tax returns for the years 1971 through 1975. Respondent reconstructed petitioner's income and expenses for these years and determined deficiencies in income taxes of $22,329.89, $18,926.92, $40,169.44, $99,122.52 and $3,283.58, respectively, as well as additions to tax for these same years pursuant to sections 6651(a), 6653(a) and 6654. OPINION Petitioner failed to file returns for the years 1971 through 1975. Respondent determined deficiencies and additions thereto for these years and issued a salutatory notice of deficiency. Prior to trial of this case respondent and petitioner agreed that petitioner has no tax deficiency for the years 1971 and 1975. There remains for decision *462 whether respondent's reconstruction of income and expenses for the remaining years is accurate, whether petitioner is entitled to a casualty loss deduction for the sinking of his boat, "Turtle", and whether petitioner is liable for additions to tax as determined by respondent. Gross Receipts
We have determined in our Findings of Fact that petitioner had business receipts from various sources totalling $59,395.00 in 1972, $122,287.73 in 1973 and $208,500.00 in 1974. Most of the items making up these totals were stipulated and were found accordingly. There remain, however, two specific items and one category of items that are still in dispute. The first specific item in dispute is the $50,000 petitioner received over a two-year period from Sadler Materials Corporation in connection with the sale of the tugboat "Bay King." The Bay King was a tugboat salvaged by petitioner off the coast of Delaware in 1973. Petitioner testified that his agreement with the owner was that he would raise the boat with no compensation other than the boat itself. He also testified that after the salvaged the boat, he spent about a year working on it and then he sold the boat to Sadler Materials *463 Corporation for $50,000. Sadler paid $40,000 by check dated May 24, 1973 and $10,000 by check dated April, 1974. Respondent contends that petitioner realized from this transaction ordinary income of $40,000 in 1973 and $10,000 in 1974. Petitioner contends that the gain he realized from this transaction, which he calculates at $13,056.55, was capital gain.
At issue is whether the Bay King was held "primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221(1), with the result that the gain from the sale of the Bay King is taxable as ordinary income rather than capital gain. Under section 1221(1), ordinary income treatment is in order if the assets are held for sale and the sale is made in the ordinary course of the taxpayer's business. United States v. Winthrop,417 F. 2d 905, 911 (5th Cir. 1969); Howell v. Commissioner,57 T.C. 546, 555 (1972). There is no dispute that the Bay King was held for sale. The parties focus their dispute on the scope of petitioner's business. Petitioner contends that he was in the salvage business and his activities vis-a-vis the boat fall outside the *464 scope of the business operation. Respondent's position is that petitioner had no specific method of operation and that raising a boat and fixing it up for resale would be in the ordinary course of business. It is true that petitioner is in the marine salvage business, but there is nothing in the record suggesting that his business was limited strictly to raising wrecked boats for a fee. Petitioner had no fixed method of operation and his company had other skills. Even before the Bay King was raised and refurbished, the company demonstrated an ability to repair and renovate boats. Petitioner took the Turtle, which was simply a 1943-built ferryboat that carried priests between islands in New York Harbor, and transformed it into a salvage boat. We have no doubt that petitioner was ready, willing and able to refurbish other boats if the opportunity presented itself and we are equally convinced that petitioner considered that ability to be one of the services his company could afford a customer. Petitioner admitted as much when he characterized these efforts as an "enterprise" to occupy time when there was nothing else to do. Insofar as we can determine from the record, at no time *465 did petitioner intend to use the Bay King in his own salvage operations, and, in fact, it was not used by him except for the raising and refurbishing. United States v. Winthrop,417 F. 2d 905, 911 (5th Cir. 1969). In the foregoing context the presence of only one episode in which petitioner refurbished a boat for resale is not particularly telling. [2] We find that raising and repairing boats for sale to customers was part of the ordinary course of petitioner's business. Accordingly, we sustain respondent's determination that the $50,000 gross receipts was ordinary in nature. [3]
*466 The second disputed item of income is the amount of income petitioner received from the Chesapeake Corporation. Respondent contends that petitioner's gross receipts for this job were $16,500. Petitioner contends that the $16,500 he received to raise a barge for the Chesapeak Corporation should be offset by the $3,000 that he paid for the barge. Apparently, petitioner purchased the barge "as is" for $3,000 from the Chesapeake Corporation while it was still on the bottom of the bay. If petitioner kept the barge after it was raised, petitioner had $16,500 income whether we view the transaction as one integrated transaction or two separate transactions. In the former instance the $16,500 is made up of net cash of $13,500 plus a barge worth $3,000. In the latter instance the $16,500 cash constitutes ordinary income to the petitioner and the $3,000 constitutes a nondeductible capital expenditure. However, it is possible that petitioner sold the barge back to the Chesapeake Corporation and the $16,500 represents payment for the salvage job plus repurchase of the barge. In that case petitioner's assertion that his income was $13,500 would be correct. The unknown in this series *467 of events is what happened to the barge. Petitioner bears the burden of proof and it is he who must suffer for deficiencies in the record on this point. We are constrained to conclude that the barge was not returned to the Chesapeake Corporation and we find that petitioner received $16,500 income from the Chesapeake Corporation during the year 1973. The category of income items in contention can be characterized, for lack of a better name, as "burden of proof" items; that is, those items in the notice of deficiency with respect to which petitioner has offered no evidence indicating that the respondent's determination is wrong. [4] Instead, petitioner baldly asserts that substantial errors in the notice of deficiency "invalidates its use as a determination of gross income in excess of that which has been stipulated." Suffice it to say that we do not find the notice of deficiency to be arbitrary and excessive. See Helvering v. Taylor,293 U.S. 507 (1935). Since petitioner has the burden of proof with respect to these items, respondent's determination is sustained. [5]
*468 Expenses
The major issue in the case concerns the amount of business expenses incurred by petitioner. Respondent determined business expenses in the notice of deficiency as follows: Type
1972
1973
1974
Labor
$10,944.71
$24,361.27
$14,340.00
Equipment Repair
6,466.15
6,297.08
1,745.57
Supplies
3,217.53
6,477.41
9,208.55
Insurance
645.88
149.00
Fuel
674.87
1,248.58
Telephone
200.28
296.18
303.38
Equipment Rentals
4,731.40
3,066.69
8,553.76
Depreciation
413.02
565.80
834.56
Utilities
54.90
300.27
Interest
434.70
Legal Fees & Accounting
516.19
4,091.25
Dock Rent
1,358.47
Towing
3,472.00
$27,137.56
$43,775.35
$44,056.54
On brief respondent conceded that petitioner is entitled to additional expenses in the respective amounts of $350, $2,904 and $22,105 for the years 1972 through 1974, for payments to Ronald Stone and James Honeycutt and respondent also conceded that petitioner is entitled to an additional business expense of $15,000 in 1974 for equipment rentals. Petitioner claims that his total business expenses were as follows: Year
Amount
Check
Cash
Total
1972
$ 43,247.77
$17,831.67
$ 61,079.44
1973
58,274.48
22,211.00
80,485.48
1974
106,318.85
57,667.00
163,985.85
*469 He presented the following evidence to substantiate his claim: 1. A series of 200 to 300 checks for each of the years written on Marine Salvage checking accounts and made out to various individuals and entities and to cash. There is no way of telling from the face of the checks whether the expenditures were deductible business expenses or were personal or capital in nature. The checks total as follows: 1972
$ 43,247.77
1973
58,274.48
1974
106,318.85
2. Petitioner's testimony that the checks represent business expenses; 3. Petitioner's testimony that he had cash expenses 25 to 33 percent over the check expenses; 4. Diary pages where petitioner purported to keep a running record of expenses on some jobs; 5. Petitioner's assertion that the income to him was one-half the amount reflected at the bottom of the diary page because his partner Stone received the other one-half of the profits. The burden of proof on this issue lies with petitioner. Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). Preliminarily, we should note that we found petitioner to be an honest witness. Unfortunately, *470 candor does not always substitute for adequate books and records. No matter how honest petitioner may be, his testimony is clouded by a confused impression of the tax law and a poor memory of the facts. Therein lies part of his problem. The diary pages prove no help to petitioner. There is no correlation between expenses per the diary pages and expenses allowed in the notice of deficiency. We can only assume that the two are duplicative. We can also dismiss out of hand petitioner's claim of cash business expenses over and above the check expenses. Petitioner was in no position to effect these purchases himself so the bulk of the purchases were presumably made by his employees. There are three likely ways that petitioner could have seen to it that these cash expenses were paid. Petitioner could have had others cash checks drawn on his checking account and then given the cash to his employees; petitioner could have reimbursed his employees by check after they paid cash out of their own pockets; and petitioner could have raised cash by cashing income checks rather than depositing those checks. If petitioner elected the first two courses of action, all the cash expenses *471 should be accounted for in the checks presented by petitioner. That would not be true if petitioner adopted the latter course of action. But petitioner's failure to allege that some of the income was not deposited to the checking account, much less introduce evidence to that effect, leaves us no choice but to assume that all receipts were deposited. Thus, we can only conclude that any cash expenses are accounted for among the checks. Petitioner's assertion that he split income in the years 1972 through 1974 with Ronald Stone and that he split income with James Honeycutt in 1974 suffers from a similar malady. We are not prepared to give petitioner credit for payments like this over and above his check expenses without evidence that some of the income checks included by respondent in the notice of deficiency were cashed rather than deposited. Moreover, the available evidence suggests that petitioner is confused about dates. Many of the checks, at least for 1972 and 1973, written to Stone were in even amounts such as $50 or $100. This suggests payment of salary on some jobs for these years. By contrast, in 1974 petitioner wrote a $10,419.00 check to Stone and several substantial *472 checks to Honeycutt totalling $11,686.00. This suggests that petitioner began sharing profits in that year, and not before. On brief respondent conceded that the larger checks (that is checks over $300) for the years 1972 through 1974 paid to Honeycutt and Stone constituted profit-shares paid to them and respondent made an appropriate adjustment to reflect that determination. Respondent's action in this regard seems imminently reasonable and we see no need to make further adjustments. That leaves the checks. No doubt respondent's agent devoted substantial time to analyzing the checks. Petitioner seeks to dismiss all respondent's efforts with a wave-of-the-hand statement that all checks represent business expenses. No matter how credible petitioner appears, we are not prepared to treat respondent's determination so cavalierly. There is no evidence that respondent's representatives have been anything but reasonable in this case on the expense issue, although they of course were constrained by petitioner's unwillingness to provide details. Respondent's attitude in this respect is perhaps best illustrated by respondent's concessions on brief that petitioner should be allowed *473 a $15,000 deduction in 1974 for crane rental from Lockwood Brothers on the Prudential Lines job and his willingness to give petitioner credit for the payments to Honeycutt and Stone over and above those allowed in the notice of deficiency. Each adjustment found very little support in the record. The effect of these adjustments are minor in 1972 and 1973 but they result in a $37,105.00 reduction in petitioner's 1974 taxable income, as determined in the notice of deficiency. In essence, the petitioner has been given credit for check expenses in the following amounts: Year
Total Allowed
Total Checks
1972
$27,532.56
$ 43,247.77
1973
46,679.35
58,274.48
1974
81,161.54
106,318.85
It is clear that petitioner did not or could not distinguish between capital expenditures and deductible expenses. It also seems likely that personal expenses were included among the checks since petitioner had no personal checking account. Indeed, in cursorily glancing through the checks at trial petitioner identified one of the checks as a personal expense. In the face of petitioner's failure to adduce specific evidence that the checks represented deductible expenses, *474 we are not prepared to make adjustments to respondent's determination of the magnitude asked by petitioner. However, we have no doubt that petitioner was no more helpful to the revenue agent than he was to the Court and we suspect that some of the check expenses were routinely disallowed for lack of substantiation. Based on this evaluation of the record but leaning heavily against the petitioner because of his failure to adduce specific evidence, we conclude that petitioner is entitled to business expenses of $5,000, $4,000 and $5,000 for the years 1972 through 1974, respectively, over and above the amounts either allowed by respondent in the notice of deficiency and/or conceded by respondent on brief. Casualty Loss
Petitioner claims a casualty loss in 1972 in the amount of $40,905.50 due to the sinking of his salvage vessel, the Turtle, in 1971. He calculates the amount of the loss as follows: $ 7,500.00
Purchase Price
39,405.50
Capital Improvements
$46,905.50
Basis
6,000.00
Insurance Recovery
($9,000 recovery
- $3,000 legal fees)
$40,905.50
Casualty Loss
The capital improvements on the boat were comprised of second-hand and *475 used equipment procured and installed by petitioner. Petitioner did not make a contemporaneous record of these expenditures. Instead, he arrived at the $39,405.50 figure by refreshing his recollection from a schedule of improvements that he prepared in attempting to recover from the insurance company. Prices on the schedule reflected replacement costs of used items at the time the schedule was prepared rather than the purchase price for these items. The loss incurred by petitioner arising out of the shipwreck is deductible in the year "sustained" under section 165 as a loss incurred in a trade or business. In cases where there is a reasonable prospect of an insurance recovery, the loss is sustained when it can be ascertained with reasonable certainty whether or not reimbursement will be received. Treas. Reg. § 1.165-1(d)(2)(i). The amount of the loss is the adjusted basis of the property destroyed as provided in section 1011 less the amount compensated for by insurance. Sections 165(c) and 165(a); Treas. Reg. § 1.165-7(b). The adjusted basis provided in section 1011 is the cost less depreciation, sections 1012 and 1016, *476 and the amount of depreciation is that "allowable" each year despite the fact that the taxpayer may have received no tax benefit because of his or her failure to claim the depreciation deduction "allowed." United States v. Ludey,274 U.S. 295, 304 (1927); Hinckley v. Commissioner,410 F. 2d 937, 940 (8th Cir. 1969). This statutory scheme poses several obstacles to petitioner's successfully claiming the casualty loss. First, there is the problem of timing. It is fair to say that the loss was "sustained" when the insurance claim was settled and the insurance company paid $9,000 on the claim. Petitioner testified that the claim was not paid in the year the Turtle sank and that he thought it was in the year following. But it was apparent that petitioner had no idea of the year in which the claim was settled. Second, there is a real question as to what petitioner actually paid for improvements on the boat. The costs petitioner assigned to these improvements were nothing more than rough approximations of replacement costs as of sometime in 1971 or 1972 or 1973 or 1974; there is no telling how much petitioner actually paid or when he made the purchases. *477 Third, there is no way to determine petitioner's basis in the boat or the improvements thereon as of 1971. Petitioner has offered no evidence of either the useful life of the Turtle or the improvements and he has also offered no evidence concerning the amount of depreciation "allowed" or "allowable." But his problems in this regard extend beyond that of merely failing to provide the Court with sufficient information with which to determine basis. We suspect that many of the improvements were made in 1962 when the Turtle was purchased. If that is true, the basis of these improvements with a useful life of ten years or less would have been reduced to $0 by the end of 1971.
In the final analysis petitioner has simply not shown that he is entitled to a casualty loss for the sinking of the Turtle. Penalties
Respondent determined that petitioner was liable for penalties for the years 1972 through 1974 under section 6651(a) for failure to file a timely income tax return and section 6653(a) for negligence. Not only has petitioner failed to introduce evidence controverting the respondent's determination, but the record affirmatively establishes that petitioner's failure to *478 file was not due to reasonable cause and it affirmatively establishes that petitioner was negligent in maintaining his books and records. Respondent's determination is sustained. Respondent also determined that petitioner is liable for the estimated tax penalty for the years 1972 through 1974 under section 6654. Section 6015(a)(2) requires every individual to make a declaration of his estimated tax for the taxable year if gross income can reasonably be expected to include more than $500 from sources other than wages, and the estimated tax can be expected to be greater than $100.00. Failure to comply with section 6015(a) due to reasonable cause or a lack of willful neglect does not relieve the taxpayer from the burden of the penalty. Estate of Ruben v. Commissioner,33 T.C. 1071 (1960). The exceptions that can relieve a taxpayer from the burden of the penalty are set forth in section 6654(d). Petitioner does not fit within any of these exceptions. The respondent's determination is sustained. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. Cf. Mitchell v. Commissioner,47 T.C. 120 (1966), where the isolated nature of the transaction was found to be a very important factor for purposes of characterizing the gain realized. In Mitchell↩ the entire resources of the joint venture were devoted to the one activity and that activity was found not to rise to the level of a trade or business. Here, the Bay King transaction is part and parcel of a broad operation that in and of itself constitutes a trade or business. 3. Had petitioner convinced us that the Bay King operation fell outside the scope of his ordinary business activities and constituted an independent enterprise, petitioner would still have to show that the Bay King was acquired as an investment and that his activities vis-a-vis the Bay King were not so substantial as to constitute a business operation within the purview of section 1221(1). See United States v. Winthrop,417 F. 2d 905, 911 (5th Cir. 1969); Adam v. Commissioner,60 T.C. 996↩ (1973). Fortunately, we need not render an opinion on this troublesome issue.
4. These income items are as follows: ↩
1972
"Unknown" and Nina Crocket
$ 4,000.00
Northhampton Trading Co.
1,900.00
1973
Blaha Towing Service
8,000.00
York River Contracting Corp.
1,500.00
Powell & Purcell Co., Inc.
1,541.00
Hanks Seafood Co.
414.40
Houseboat
1,200.00
1974
Allied Chemical
48,500.00
Everett Haywood
25,000.00
5. The stipulation of facts indicates that petitioner received at least $48,000 and not more than $48,500 from Allied Chemical in the year 1974. Petitioner testified at trial that he thought he only received $48,000 but he was by no means sure of his assertion. We sustain respondent's determination that he received $48,500.↩