T.C. Memo. 1996-419


UNITED STATES TAX COURT


LOREN F. PAULLUS AND DONNA PAULLUS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RIDGEMARK CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 6105-93, 6106-93.    Filed September 17, 1996.


Clarence J. Ferrari, Jr., George P. Mulcaire, J. Timothy
Maximoff, and C. David Spence, for petitioners.

Christopher J. Faiferlick and Barbara M. Leonard, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined a deficiency in
petitioners Loren F. Paullus and Donna Paullus' 1989 Federal
income tax in the amount of $124,324 and a penalty under section

6662(a)[1] in the amount of $10,690.  Respondent also determined a deficiency in petitioner Ridgemark Corp.'s 1989 Federal income tax in the amount of $2,488,051 and a penalty under section 6662(a) in the amount of $497,610.

After concessions, the issues remaining for our consideration are:  (1) Whether real property held and exchanged in 1989 by petitioner Ridgemark Corp. qualifies for income tax deferral pursuant to section 1031; and (2) whether petitioners Ridgemark Corp. or Loren F. and Donna Paullus are separately liable for penalties under section 6662(a).

### FINDINGS OF FACT[2]

Petitioner Ridgemark Corp. (Ridgemark) is incorporated, and its principal place of business at the time its petition was filed was Hollister, California.  Petitioners Loren F. and Donna Paullus (petitioners), at the time their petition in this case was filed, resided in Paicines, California.  Loren F. Paullus (Paullus) was president of Ridgemark from 1971 until March 1992. He also served on Ridgemark's board of directors.

Paullus owned and operated a 110-acre turkey ranch in Hollister, California, which he considered developing into a golf

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year under consideration, and all Rule references are to this Court's Rules of Practice and Procedure.

[2] The parties' stipulation of facts and exhibits are incorporated in this opinion by this reference.

course as early as 1960. Paullus decided to proceed after determining that his ranch possessed a substantial water supply that could support the proposed golf course operation.

Ridgemark was incorporated by Paullus and other investors on or about November 4, 1971. The Pre-Incorporation Subscription Agreement provides that Ridgemark will be able to

> transact and carry on the business of acquiring, owning and improving land for recreational and residential purposes, selling memberships in and playing privileges in a golf course, and subdividing and selling improved or unimproved lots for residential purposes * * *

Ridgemark's articles of incorporation also provide that the corporation's business purposes are "To engage primarily in the specific business of acquiring, developing, owning and selling real property."

Paullus contributed the 110-acre turkey farm to the corporation in exchange for stock. The other investors contributed cash and real property in exchange for stock in Ridgemark. At the time of incorporation, Paullus acquired 59.3 percent of Ridgemark's outstanding stock.

On or about November 12, 1971, Ridgemark was authorized by its board of directors to purchase golf course irrigation equipment from Western Rain Bird Sales. Ridgemark also purchased 102-acre and 70-acre parcels for the golf course project.

On June 22, 1972, Ridgemark filed a Declaration of Covenants and Restrictions with San Benito County, California, for

Ridgemark Estates, a planned development.  An unincorporated association, Ridgemark Homes Association, was formed for the purpose of enforcing and administering covenants and restrictions, as well as approval for home construction and lot improvements.  Lot owners were eligible to be members of Ridgemark Homes Association.  Ridgemark Estates was located adjacent to the golf course.

Ridgemark constructed the golf course and related recreational facility.  Upon completion of the Ridgemark Golf and Country Club, Ridgemark sold golf club memberships.  Memberships consisted of annual, renewable licenses to use the facilities with no proprietary rights or privileges.  Golf memberships were sold by Ridgemark, in part, to fund the construction, operation, and expansion of the golf course facility.

For a few years, Ridgemark sold unimproved and unsubdivided lots.  These sales also provided golf course funding to Ridgemark.  Ridgemark generally followed the practice of selling improved residential lots to purchasers for cash for the construction by such purchasers of single family houses.

Ridgemark acquired a real estate brokerage license. Paullus' daughter ran the sales department.  On or about April 1977, however, Ridgemark's board of directors terminated its practice of selling improved residential lots.  The board decided that it was desirable to limit Ridgemark's activities to the sale

of unimproved and improved land, the operation of Ridgemark Golf and Country Club, and the conduct of the real estate brokerage business.  The board desired to protect the corporation from liabilities that might arise from the construction and financing business.  Consequently, on May 3, 1977, Ridgemark Construction Corp. (Construction) and Ridgemark Financial Corp. (Financial) were formed to segregate the residential lot activity.

Construction was to engage in construction, subdivision, development, and sale of residential units and townhomes. Financial was to engage in financing, development, improvement, and sale of single family lots.  Ridgemark's board of directors resolved to sell improved lots to Construction and Financial at prices equivalent to cost plus no less than 25-percent profit. Before Financial and Construction were formed, Ridgemark had sold approximately 200 lots.  After that, Ridgemark was not involved in the improvement and sale of lots.

As of April 1977, Ridgemark owned the following real property:

```
1.   Lot 82, Unit #2
2.   Several lots in Unit #3
3.   Golf course land
4.   Clubhouse land
5.   Miscellaneous parcels of land near the water tower
6.   27.9 acres at the end of George's Drive
7.   8 acres near Ray's Circle
8.   5.95 acres below Ridgemark Village
9.   7.3-acre parcel
```

10. 37.34 acres at the northeast corner of Airline Highway and Fairview Road

11.  47.2 acres where the maintenance barn, the guest cottage site, and the old Paullus residence are located
12.  35.08-acre parcel
13.  7-acre parcel

On October 18, 1977, Ridgemark conveyed improved and unsubdivided land to Construction for $175,000.  The final subdivision public report was issued to Construction on February 1, 1979.

During 1980, Ridgemark expanded the golf course because the existing facilities were becoming overcrowded.  A $1 million expansion increased the clubhouse facility from 6,600 to 22,600 square feet.  Ridgemark also promoted a joint venture with private investors to build 32 guest cottages for rental purposes in order to increase its attraction and use as a destination golf resort.  The expansion had a positive effect on Ridgemark's golf and recreation business.  Ultimately, Ridgemark acquired ownership of the guest cottages.

As of April 1987, Ridgemark owned the following assets:

1.  Lot 82, Unit #2
2.  Several lots in Unit 3
3.  Approximately 150 acres of golf course land
4.  Approximately 5 acres of clubhouse land
5.  Approximately 20 acres of land near a water tower (Perry Hill)
6.  27.9 acres at the end of George's Drive
7.  8 acres near Ray's Circle
8.  5.95 acres below Ridgemark Village
9.  7.3-acre parcel near entrance to Ridgemark Village

10.   37.34 acres at the northeast corner of Airline Highway
      and Fairview Road

11. 47.2 acres where the maintenance barn, guest cottage site, and the old Paullus residence were located
12. 35.08 acres composed of three parcels located at George's Drive, Ray's Circle, and the end of Ridgemark Drive
13. 7-acre parcel located off Ridgemark Drive

Ridgemark acquired only two properties after April 1977: (1) March 27, 1984, 1.89 acres at the corner of a major highway; and (2) February 1985, 269 acres from Bushmont Properties (Bushmont property).  Ridgemark paid $1,825,379.90 for the Bushmont property.

Ridgemark built a second 18-hole golf course, a tennis center, and a new clubhouse facility on approximately 130 acres of the Bushmont property.  The new 18-hole golf course located on the Bushmont property had a cost of about $1,600,000.  The value of the Bushmont property, after improvements, was estimated to be $3 million.  A lighted 10-court tennis facility and a new 5,000-square-foot clubhouse located on the Bushmont property cost approximately $492,000.  Ridgemark also added 175 parking spaces.

The vast majority of Ridgemark's real property holdings had been acquired as of 1977.  Between April 1977 and 1989, Ridgemark sold the following properties to either Financial or Construction:

| Property Sold | Sale Price | Acquisition Cost | Improvement Cost | Sale Date |
|---|---|---|---|---|
| 35 acres, Unit #4 12/31/77 | $350,880 | $153,732.00 | $77,550.00 | |
| 7 acres, Unit #5 10/18/77 | 175,000 | 58,670.00 | 80,901.72 | |
| 7.3 acres, Unit #6 3/31/81 | 300,000 | 32,802.22 | 49,496.61 | |
| 41 acres, Unit #7 4/12/85 | 2,460,000 | 369,583.00 | 249,550.00 | |
| 13.43 acres, Unit # 8, phase one 11/18/85 | 1,347,000 | 121,060.00 | 137,123.96 | |
| 10.53 acres, Unit #8, phase two 8/24/87 | 1,053,000 | 94,919.74 | 5,718.20 | |
| 16.23 acres, Unit # 9 6/30/87 | 1,054,950 | 146,300.79 | 63,122.23 | |

On March 15, 1985, Ridgemark agreed to sell the units 7 and 8 properties to Financial and Construction, respectively. By that time, Ridgemark had acquired tentative maps for units 7 and 8. The agreements provided that, concurrently with the recording of the final maps for units 7 and 8, Ridgemark would sell the properties to Financial and Construction. On April 12, 1985, and November 18, 1985, the final maps for units 7 and 8, respectively, were granted and the transactions concluded.

On February 24, 1987, Ridgemark agreed to sell the unit 9 property to Financial. By that time, Ridgemark had obtained approval for a tentative map. The agreement contains a clause providing that within 90 days of the recording of the final map for unit 9, Ridgemark would sell the property to Financial. The

final map for unit 9 was recorded on May 19, 1987. Ridgemark's May 26, 1987, corporate minutes reflect that it intended to sell the unit 9 property to Financial within 1 month. The property was sold on June 30, 1987, and deeded July 10, 1987.

When Ridgemark sold the units 4 through 9 properties to Financial and Construction, Robert A. Prior (Prior), Ridgemark's attorney, did the preliminary filing of the applications with the State of California Department of Real Estate (DRE). These lots were developed and sold by Construction or Financial, although the preliminary approval for subdividing was obtained in Ridgemark's name. The final report, however, was issued in the name of the subdivider, either Financial or Construction. The lots herein were zoned for the highest possible use (residential) in order to maximize possible loans by third parties.

On February 24, 1987, in an effort to "increase the marketability of lots and townhomes", Ridgemark's board of directors voted to restrict the sales of new golf memberships to people who owned property in and resided in Ridgemark Estates. On May 26, 1987, Ridgemark's board of directors met to discuss Ridgemark's financial status, and the board reversed its decision of February 24, 1987:

> [Ridgemark] will market a golf subscription to persons who are not owners of a lot or a unit and a resident of Ridgemark Estates. The subscription price will be $4,000.00. The subscription will have a term of five years, and will not be transferable and will have no golf cart use privileges, and can be converted to a

> class A golf, tennis and social membership or class A golf and social membership if the subscriber becomes the owner of a lot or unit and a resident of Ridgemark Estates within the five year term and pays the excess of the membership initiation fee over the $4,000.00 subscription price.

The corporate minutes reflect that the board of directors considered the further expansion of the golf facility and other related activities, such as the purchase of 10 gasoline-powered golf carts. The board also explored the possibility of future development of all the remaining land south of Airline Highway. Ridgemark's engineer estimated that approximately 300 lots would be produced at an average net sale price of $60,000, which would produce gross profits of $18 million. An additional $9 million could be produced by selling the lots improved with houses.

In the same meeting, the board of directors also authorized Paullus to have preliminary discussions with representatives of potential purchasers regarding the sale of Ridgemark. By that time, certain Ridgemark shareholders sought to dispose of their shares. Paullus desired to be relieved of the responsibilities involved in the management of Ridgemark Golf and Country Club. He also sought to liquidate Ridgemark's assets in order to expand into a new venture, the proposed Paicines project.

On February 23, 1988, the corporate minutes reflected the fact that the tentative map for the unit 10 property, comprising 164 lots, had been filed with the San Benito County Planning

Department.  The tentative map for the unit 10 property was approved on April 6, 1988.

On May 5, 1988, the board investigated the advantages inherent in having Ridgemark perform as the subdivider of unit 10 as compared with selling the property to Construction and having it act as the subdivider.  The board determined that the development of unit 10 by Construction would be preferable.

On August 2, 1988, Joseph Drosihn (Drosihn), a representative of Y.L. Shen (Shen), contacted Ridgemark regarding the purchase of all the developable land owned by Ridgemark.  Drosihn and Paullus agreed that land that had been formerly conveyed to Financial would be reconveyed to Ridgemark and included within its assets upon sale.

On August 8, 1988, Ridgemark represented that it intended to subdivide land that was covered under prior agreements with the local water utility.  Consequently, the unit 10 property needed sewer and water service installed.  Ridgemark was referred to as "Subdivider" in the agreement and agreed to pay $290,465 for installation of water facilities and $282,559 for the installation of sewerage facilities.

On August 12, 1988, Ridgemark's board of directors met to discuss the offer by Shen.  The minutes of the meeting state:

> The President [Paullus] advised the meeting that his
> legal and tax advisors are developing a transaction
> structure to include a tax free exchange in the sale of
> the Corporation and the purchase of the Paicines Ranch,

for the benefit of him and his associates in the Paicines Ranch project and, in order to implement such structure, he and his associates are willing to purchase the shares of the capital stock of the Corporation from the other shareholders at the same price per share as that paid by the purchaser, less a prorata [sic] share of the brokers' commission, and with an interest rate of 10% per year on the deferred portion of the purchase price and providing each selling shareholder the security given by the purchaser.

On August 23, 1988, the board further discussed the Drosihn proposal. Paullus reported that he had reached an agreement with Drosihn that once approval of the final map for unit 10 was obtained, the sales of lots in unit 10 would commence. The minutes contain the notation that there were 97 people interested in purchasing lots in unit 10.

In an August 27, 1988, letter, Shen's representative was informed that Ridgemark's board had authorized its corporate officers to engage in negotiations to sell Ridgemark. The letter provides that neither the assets nor the stock of Construction or Financial were involved in any proposed sale. Initially, negotiations contemplated a straightforward sale of all of Ridgemark's stock to Shen.

An agreement with San Benito County recorded on September 22, 1988, reflects that Ridgemark was "in the process of developing or improving" the unit 10 property. Ridgemark was required to make improvements, including the necessary paving, curbs, gutters, catch basins, pipes, culverts, water mains, storm

drainage systems, and sanitary sewers.  Ridgemark and San Benito County agreed that Ridgemark would be contractually liable to complete the enumerated improvements after the issuance of the final map.  On September 23, 1988, Ridgemark notified DRE that as subdivider of unit 10, it would grant nonexclusive easements to certain streets to the owners of the lots in unit 10.

On September 26, 1988, Ridgemark entered into a Subdivision Services Agreement with Bill Vierra & Associates, Inc. (Vierra). In this agreement, Ridgemark agreed to be represented by Vierra in filing the Preliminary and Final Public Report applications with DRE in connection with "Ridgemark Estates No. 10".

On the same date, Vierra filed an application for a Final Public Report for Ridgemark Estates, unit 10.  Ridgemark is reflected as the subdivider, with Paullus as its representative. The Notice of Intention for unit 10 reflects that it would be used solely for single family residential homes.  However, the lots in unit 10 would be sold as vacant lots.  The ultimate purchaser would be responsible for special fees charged to the lot, such as school impact fees, fire and police department impact fees, and traffic mitigation impact fees, either when the purchaser obtained a building permit or prior to occupancy. Finally, it was indicated that membership in Ridgemark Golf and Country Club would be utilized as an inducement for the unit 10 lots.  On November 14, 1988, Ridgemark's board of directors

determined that Shen's proposal was unacceptable, and Paullus was authorized to terminate negotiations and "proceed with the sales of lots in the Unit 10 subdivision." On December 6, 1988, Shen's representative, Drosihn, and Paullus, however, signed a letter of intent delineating the terms and conditions for Shen's purchase of Ridgemark's outstanding shares. Ridgemark reserved the right to structure a tax-free or tax-deferred exchange without any added cost or risk to the buyer.

On December 7, 1988, Shen rejected the proposed stock sale because of "an adverse unresolved tax problem". Drosihn, however, advised Paullus that Shen was still interested in purchasing Ridgemark and sought a meeting of tax specialists to structure the transaction in a mutually acceptable manner to resolve the tax problem. It became evident that Shen was not interested in purchasing the Ridgemark Golf and Country Club unless Paullus agreed to manage the operation for a period of 10 years. Paullus was unwilling to continue the management of the golf course and resort facilities. On December 13, 1988, Ridgemark's board of directors met to discuss Shen's new offer to purchase the 120 lots in the unit 10 subdivision.[3] The tax consequences of the proposed purchase were discussed in the minutes.

---

[3] The minutes for Aug. 23, 1988, reflect that due to a boundary dispute, Ridgemark decided to exclude the disputed strip of land and reduced the land in question from 164 to 120 lots.

Paullus counteroffered in a December 15, 1988, letter, which proposed a restructured transaction under which Shen would acquire Ridgemark's assets except the land, facilities, and equipment of Ridgemark Golf and Country Club. Specifically, Ridgemark offered to sell the unit 10 property for a price of $10 million, with Shen assuming the responsibility of completing the improvements related to the subdivision of the property into buildable lots. An alternative offer for $11,500,000 was made under which Ridgemark would complete the improvements. The letter offered the unit 10 property for sale upon the terms and conditions specified, which included Ridgemark's tax-free exchange requirement. The schematics associated with the offer included the statement that the proposed transaction appeared to qualify for a section 1031 exchange. On December 21, 1988, Paullus sent a completed draft of the letter and schematic of the proposed transaction. Ridgemark obtained the approval of the final subdivision map and constructed certain offsite improvements for the unit 10 property because Shen, through assignees, wanted to be able to build houses and sell lots as soon as possible after closing.

On January 9, 1989, Ridgemark's board of directors removed the restriction that preferred[4] memberships in Ridgemark Golf and

---

[4] The preferred memberships (class A) entitled those members to full privileges of the recreational facility.

Country Club be sold only to owners of lots who resided in Ridgemark Estates. At the same time, Paullus offered to purchase the shares of Ridgemark's shareholders who did not wish to participate in the development of the Paicines area properties. On January 23, 1989, the Loan, Option and Purchase Agreement (Purchase Agreement) was approved by the board of directors. The Purchase Agreement provided that Ridgemark, as the seller, would diligently complete, at its expense, all offsite improvements for unit 10. Ridgemark completed the offsite improvements after the Purchase Agreement execution at a cost of about $1,600,000. The Purchase Agreement provided that Ridgemark had the right to structure a tax-deferred exchange, and Shen was required to cooperate to effectuate such an exchange. Moreover, Ridgemark agreed to make golf and country club memberships available to purchasers of homes in the unit 10 property on the same terms and conditions as to the preferred members.

The Purchase Agreement also provided that Shen had two options to purchase, in increments, any remaining developable land owned by Ridgemark. The first option was exercisable in 1991, and the second in 1993. Each option was worth approximately $7 million. Neither option was exercised. Ultimately, the optioned land reverted to Ridgemark.

Shen was expected to complete the purchase of the unit 10 lots by March 27, 1989. If Shen did not complete the purchase of

the unit 10 lots, Paullus outlined a plan to the board for a joint venture with outside investors. Ridgemark would contribute the unit 10 lots that would be utilized for the venture. The purchase and transfer of the unit 10 property was completed on March 27, 1989, for a final gross selling price of $11,250,000.

On April 7, 1989, Paullus exercised his option to purchase the outstanding shares of his fellow shareholders in Ridgemark. After the transaction, petitioners personally owned 36.32 percent of Ridgemark's outstanding shares. Paullus, along with his wife, were also the trustees of the Loren and Donna Paullus Family Trust, which owned 35.02 percent of Ridgemark's outstanding shares. In 1990, Ridgemark sold its golf courses, clubhouses, and recreational facilities for $12 million to the members of Ridgemark Golf and Country Club.

The property acquired by Ridgemark as an exchange consisted of approximately 2,261 acres (the Paicines property). The Paicines property was acquired with the intention of developing a new and expanded golf course and resort facility. Approximately 1,000 acres were contemplated for five or six golf courses, clubhouses, and appurtenant buildings. To obtain a better financing note, the Paicines property was zoned for residential purposes.

From 1980 to 1993, Ridgemark filed statements with the State of California, and in the space for the "type of business", the following was reflected:

| Year | Business |
|------|----------|
| 1980 | Golf and Country Club |
| 1981 | Golf and Country Club |
| 1982 | Golf and Country Club |
| 1983 | No record |
| 1984 | Golf and Country Club |
| 1985 | Left blank |
| 1986 | Left blank |
| 1987 | Left blank |
| 1989 | Golf and Country Club |
| 1990 | Ranch Properties |
| 1991 | Left blank |
| 1992 | Left blank |
| 1993 | Left blank |

At the time the petition was filed in this case, Ridgemark owned the following property:

1. Approximately 20 acres of land near a water tower (Perry Hill)
2. 27.9 acres at the end of George's Drive
3. 8 acres near Ray's Circle
4. 5.95 acres below Ridgemark Village
5. 37.34 acres at the northeast corner of Airline Highway and Fairview Road
6. 47.2 acres where the maintenance barn, the guest cottage site, and the old Paullus residence were located

Ridgemark's operating revenue, costs of sales, and gross income for its golf operations were:

| Fiscal Yearend | Golf Operating Revenue | Golf Operating Cost of Sales | Golf Gross Income |
|---|---|---|---|
| 1977 | $433,052 | $460,242 | ($27,190) |
| 1978 | 465,827 | 404,665 | 61,162 |
| 1979 | 461,287 | 500,717 | (39,430) |
| 1980 | 758,853 | 708,625 | 50,228 |
| 1981 | 1,263,595 | 1,101,881 | 161,714 |
| 1982 | 1,386,201 | 1,154,674 | 231,527 |
| 1983 | 1,813,201 | 1,446,022 | 367,179 |
| 1984 | 2,189,645 | 2,133,112 | 56,533 |
| 1985 | 2,419,178 | 2,279,223 | 139,955 |
| 1986 | 2,520,139 | 2,253,109 | 267,030 |
| 1987 | 3,131,939 | 2,535,181 | 596,758 |
| 1988 | 3,239,153 | 2,737,566 | 501,587 |
| 1989 | 3,149,241 | 2,885,885 | 263,356 |
| Total | 23,231,311 | 20,600,902 | 2,630,409 |

Ridgemark's operating revenue, costs of sales, and gross income for its real estate operations were:

| Fiscal Yearend | Real Estate Operating Revenue | Real Estate Cost of Sales | Real Estate Gross Income |
|---|---|---|---|
| 1977 | $1,015,183 | $493,010 | $522,173 |
| 1978 | 344,291 | 220,121 | 124,170 |
| 1979 | 257,506 | 169,666 | 87,840 |
| 1980 | -0- | -0- | -0- |
| 1981 | -0- | -0- | -0- |
| 1982 | 305,409 | 21,656 | 283,753 |
| 1983 | 363,350 | 107,592 | 255,758 |
| 1984 | 16,504 | 14,187 | 2,317 |
| 1985 | 1,043,797 | 273,270 | 770,527 |
| 1986 | 1,747,094 | 386,014 | 1,361,080 |
| 1987 | 2,194,609 | 432,086 | 1,762,523 |
| 1988 | 1,743,924 | 319,629 | 1,424,295 |
| 1989 | 1,502,664 | 307,855 | 1,194,809 |
| Total | 10,534,331 | 2,745,086 | 7,789,245 |

Ridgemark's total gross operating revenue, cost of sales, and gross income were $33,765,642, $23,345,988, and $10,419,654, respectively, for the years between 1977 and 1989.

The membership fees for Ridgemark Golf and Country Club increased from $700 in 1971, when Ridgemark was formed, to approximately $14,000 in 1990, when it was sold to the members.

Petitioners deducted $292,773 for depreciation on Schedule F of their 1989 Federal income tax return with respect to certain farm property. Respondent determined that the depreciation deduction claimed by petitioners exceeded the allowable amount by $191,637. The parties agreed that the proposed adjusted capital gain of $213,993 would be reduced to $174,030. Petitioners have conceded the remaining adjustments.

OPINION

The parties agree that Ridgemark "exchanged" the unit 10 property for the Paicines property. The disagreement concerns whether the unit 10 property was held primarily for sale in the ordinary course of Ridgemark's business. Respondent contends that Ridgemark was a real property dealer and that the exchange of the unit 10 property was merely a continuation of established subdivision activities. Ridgemark contends that the unit 10 property was sold to liquidate its assets, and that the offsite improvements were merely a condition of the sale. Petitioners bear the burden of establishing that respondent's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Generally, section 1001(c) requires that gain or loss on the sale or exchange of property shall be recognized. Section

1031(a) provides for the nonrecognition or deferral of gain or loss when "property held for productive use in a trade or business or for investment * * * is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."

Section 1031(a) treatment, however, does not apply to any exchange of "property held primarily for sale". See sec. 1031(a)(2). Section 1221(1) provides that a capital asset does not include by definition "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

In Malat v. Riddell, 383 U.S. 569, 572 (1966) (quoting Corn Prods. Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955), and Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130, 134 (1960)), the Supreme Court explained the function of the section 1221(1) definition as differentiating "between the 'profits and losses arising from the everyday operation of a business' * * * and 'the realization of appreciation in value accrued over a substantial period of time'". The Court also defined "primarily", as utilized in section 1221(1), as "'of first importance'" or "'principally.'" Whether property is held by a taxpayer primarily for sale to customers in the ordinary course of a trade or business is essentially a factual question. Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 316 (1991).

Other cases have developed a framework for determining whether sales of land are considered sales of a capital asset or sales of property held primarily for sale to customers in the ordinary course of a taxpayer's trade or business.  See Major Realty Corp. & Subs. v. Commissioner, 749 F.2d 1483 (11th Cir. 1985), affg. in part and revg. in part T.C. Memo. 1981-361; Byram v. United States, 705 F.2d 1418 (5th Cir. 1983); Suburban Realty Co. v. United States, 615 F.2d 171 (5th Cir. 1980); Parkside, Inc. v. Commissioner, 571 F.2d 1092, 1096 (9th Cir. 1977), revg. T.C. Memo. 1975-14; Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976); United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969); Estate of Freeland  v. Commissioner, 393 F.2d 573 (9th Cir. 1968), affg. T.C. Memo. 1966-283; Los Angeles Extension Co. v. United States, 315 F.2d 1 (9th Cir. 1963).

In Suburban Realty Co. v. United States, supra at 178, the Court of Appeals stated that the definition of "capital asset" gave rise to three questions:

1) was taxpayer engaged in a trade or business, and, if so, what business?
2) was taxpayer holding the property primarily for sale in that business?
3) were the sales contemplated by taxpayer "ordinary" in the course of that business?

In United States v. Winthrop, supra, and Biedenharn Realty Co. v. United States, supra, various factors were considered in answering the three questions:

(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the

property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. [United States v. Winthrop, supra at 910; citation omitted.]

See English v. Commissioner, T.C. Memo. 1993-111; Dunwoody v. Commissioner, T.C. Memo. 1992-721; see also Parkside, Inc. v. Commissioner, supra at 1096; Estate of Freeland v. Commissioner, supra at 582; Los Angeles Extension Co. v. United States, supra at 3.

The frequency and substantiality of sales over an extended period of time are integral indicia to be considered. The juxtaposition of the two aforementioned factors, therefore, "'will usually conclude the capital gains issue against [the] taxpayer.'" Suburban Realty Co. v. United States, supra at 176-178 (quoting Biedenharn Realty Co. v. United States, supra at 418).

At the same time, the courts have held that these factors are not exclusive. United States v. Winthrop, supra at 911. Rather, each case must be decided on its own peculiar facts. Specific factors, or a combination thereof, are not necessarily controlling. Biedenharn Realty Co. v. United States, supra at 415.

Respondent contends that Ridgemark was a dealer in real property, and intended to sell the unit 10 property in the

ordinary course of its business.  Essentially, respondent asserts that the unit 10 property was inventory, and did not qualify for the nonrecognition provision of section 1031.  Ridgemark argues that it held the unit 10 property for investment purposes.

Consequently, the issue is clearly drawn, and we focus on the characterization of the unit 10 property held by Ridgemark.

1.  Nature and Purpose of the Acquisition of the Property and the Duration of Ownership

Ridgemark segregated its business of operating Ridgemark Golf and Country Club from the development and sales of lots. Development and sales were placed in separate corporate entities. After the creation of the new corporations, Ridgemark had seven sales of property, excluding the unit 10 property.  The sales were made over a 12-year period exclusively to Financial or Construction, the new corporate entities, which developed and sold real property.

The one significant acquisition (the Bushmont property) was used to expand Ridgemark Golf and Country Club.  Ridgemark also found it necessary to sell some of its real property holdings to finance a new 18-hole golf course and other facilities on the Bushmont property.  Ridgemark's primary activity was the development and operation of golf courses.  To that end, it was successful, thereby increasing the value of the facility, including the adjacent real property.  Specifically, demand for the lots and residences in Ridgemark Estates was increased by coupling them to the golf and country club memberships.

Ridgemark's success can be seen in the price increases for golf and country club membership from $700 in 1971 to approximately $14,000 in 1990, when the golf and country club was sold to its members. As significant, Ridgemark did not intend to sell the unit 10 property on an individual basis. In early 1987, a number of Ridgemark's shareholders decided to disassociate themselves from the business of owning and operating Ridgemark Golf and Country Club. This was to be accomplished by selling all of Ridgemark's assets, including the real property holdings. Originally, it was to be accomplished by a cash sale of Ridgemark's outstanding shares. Shen was the ostensible purchaser until the adverse tax consequences deterred him. Shen then became interested in the business of Ridgemark Golf and Country Club until Paullus advised him that he would not manage the facility after its sale. Shen thereafter developed an interest in the developable real property held by Ridgemark, including the unit 10 property.

Throughout the period, 1980 through 1989, Ridgemark consistently reported its business activity as the operator of a golf and country club. We find this to be probative evidence of Ridgemark's primary involvement in the golf and country club business. See Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979).

Appreciation in value of the unit 10 property stems from its proximity to the facilities extant in the Ridgemark Golf and

Country Club, as well as the existing residential developments that Construction and Financial developed and sold. By itself, property sold as undeveloped land, with development to be done under contract for the purchasers, does not automatically reflect that the land is held for sale to customers in the ordinary course of a taxpayer's trade or business. Reithmeyer v. Commissioner, 26 T.C. 804, 813 (1956).

Finally, we note that Ridgemark held the unit 10 property for approximately 4 years prior to the transaction in question. This relatively long holding period also tends to support the conclusion that Ridgemark held the property for investment purposes. Ridgemark held a relatively significant amount of real estate from 1977 and 1987 with only limited sales to related companies. This is more indicative of an investment motive in Ridgemark.

We note that a sale of a large tract in a single transaction does not necessarily mean that the property was not held for sale in the ordinary course of a taxpayer's trade or business. See Major Realty Corp. v. Commissioner, 749 F.2d 1483, 1489 (11th Cir. 1985), affg. in part and revg. in part on another issue T.C. Memo. 1981-361; Williams v. United States, 329 F.2d 430 (5th Cir. 1964); Lawrie v. Commissioner, 36 T.C. 1117, 1121 (1961). However, Ridgemark does not have a history of continuously and regularly purchasing raw land that was later sold for development.

The relative paucity of purchases and sales, coupled with the other factors discussed herewith, suggests that the real property was peripheral to the business of operating Ridgemark Golf and Country Club.  Pritchett v. Commissioner, 63 T.C. 149, 164 (1974).

Accordingly, unit 10 was held for a relatively long period of time and was acquired for investment purposes.

2.  The Extent and Nature of the Taxpayer's Efforts To Sell the Property

Ridgemark and Paullus sought to sell assets in order to concentrate on developing a golf resort in Paicines.  The question is whether there were any acts of sales promotion on the part of Ridgemark or its agents.  For example, improving and developing the land is a possible avenue to promote sales.  See Reithmeyer v. Commissioner, supra at 813 ("The obvious reason for the platting and subdividing was to attract buyers.").  The Fifth Circuit Court of Appeals in Estate of Barrios v. Commissioner, 265 F.2d 517 (5th Cir. 1959), revg. 29 T.C. 378, 383 (1957), while reversing the Tax Court for other reasons, agreed with the general principle that improvement and development of land was an avenue to promote sales.  The Court of Appeals stated:

> The idea of selling a large tract of land in lots embraces necessarily the construction of streets for access to them, the provision of drainage and the furnishing of access to such a necessity as water.  It is hardly conceivable that taxpayer could have sold a lot without doing these things.  To contend that reasonable expenditures and efforts, in such necessary undertakings are not entitled to capital gains treatment is to reject entirely the established

principle that a person holding lands under such circumstances may subdivide it for advantageous sale. [Id. at 520.]

Property sold as undeveloped land with development to be done by the seller under contract for the purchasers does not automatically cause the land to be held for sale to customers in the ordinary course of the taxpayer's trade or business. Reithmeyer v. Commissioner, supra at 813. In the setting of this case, we find that selling the unit 10 property with the offsite improvements required by Shen did not convert it into a sale in the ordinary course of a trade or business.

Respondent contends that Ridgemark's property was zoned for the highest use (residential), and that fact is dispositive of Ridgemark's intent. We believe the zoning classification was necessary to maximize possible loans by third parties. Although residential zoning is a necessary element for subdivision, it does not, per se, convert property to inventory status.

The record does not demonstrate that Ridgemark utilized an agent or broker. Although the August 12, 1988, minutes mention brokers' commissions, it appears that Ridgemark did not want an agent to negotiate for it, but that it was willing to pay a commission or a finder's fee if a successful sale was finalized.

Finally, we find it troublesome that Ridgemark maintained a sales office and that there was a list of 97 people interested in purchasing lots in the unit 10 property. That is one factor that is indicative of an intention to sell the unit 10 property in the

ordinary course of Ridgemark's business.  Paullus' daughter also had names of potential purchasers of lots in unit 10.  There was some connection between the unit 10 property and Ridgemark's sales office.

Additionally, Ridgemark concedes that before the sale of the unit 10 property to Shen, it was taking steps to develop and sell the property in the process of liquidating its holdings.  Respondent argues that this made Ridgemark a dealer in real property when it engaged in preparations to sell the unit 10 property prior to its final sale to Shen.  Ridgemark contends that it should not be deprived of its investor status simply because it prepared to sell the land to third parties.

Overall, we believe Ridgemark's position is supported by the facts.  Ridgemark sought to liquidate its assets so it could maximize the amount of cash and attention it could focus on the proposed Paicines golf and resort facility.  It was contemplated that, if the transaction with Shen was not consummated, Ridgemark would follow the same pattern it had followed in the past.  In other words, Ridgemark would sell the unit 10 property to either Construction or Financial.

3.  The Number, Extent, Continuity, and Substantiality of the Sales

Courts have generally viewed frequent sales that generate substantial income as tending to show that property was held for sale rather than investment.  Suburban Realty Co. v. United States, 615 F.2d at 181; Biedenharn Realty Co. v. United States,

526 F.2d 409 (5th Cir. 1976).  Conversely, infrequent sales resulting in large profits tend to show that property was held for investment.  Bramblett v. Commissioner, 960 F.2d 526 (5th Cir. 1992).

The unit 10 property was sold to Shen for $11,250,000. Previously, Ridgemark was willing to sell the unit 10 property to Shen for $10 million, which incorporated approximately $1,500,000 of offsite improvements, with a $2,563,454 basis.  Consequently, at the sale, Ridgemark received net proceeds of approximately $9 million.  This is evidence of long-term appreciation as opposed to normal inventory markup.  We also recognize that Ridgemark's golf operating revenue is approximately twice the revenue from real estate transactions.  This factor quantitatively reflects that Ridgemark's primary source of income and business operation was the management of a golf resort facility.  The real estate sales were, at best, peripheral.

There was a significant difference between the unit 10 property and prior property sales.  Ridgemark incurred costs of approximately $2 million in completing the unit 10 property, compared to about $600,000 expended in connection with the seven parcels that had been sold to Financial or Construction.  Of the $2 million, approximately $1,600,000 was spent for improvements in satisfaction of the Agreement with Shen.  We do not agree with respondent that Ridgemark would have, in any event, made these improvements irrespective of whether Shen completed the sale.

Finally, Ridgemark sold eight parcels of land in a 12-year period between 1977 and 1989.  By comparison, only one significant purchase of property was made subsequent to Ridgemark's 1971 formation (Bushmont property in 1985).

Accordingly, Ridgemark fits the pattern of infrequent but substantial sales of property which indicates, generally, that it was held for investment purposes.  See <u>Bramblett v. Commissioner</u>, <u>supra</u>.

### 4.  <u>The Extent of Subdividing, Developing, and Advertising To Increase Sales</u>

Respondent asserts that Ridgemark routinely subdivided and incurred substantial improvement costs before selling the land to either Construction or Financial.  Also, respondent contends that the fact that Ridgemark recorded final subdivision maps on certain property before the sales were complete demonstrates that it was involved in the business of dealing in real property.

The seven sales of real property during the 12-year interval between 1977 and 1989 can be divided into two categories: (1) Three sales of large unsubdivided parcels, and (2) four sales in which the title to the property could not be transferred without a new map being recorded to create a separate legal parcel.[5]  Ridgemark contends that the recordation of a final map

---

[5] See Cal. Govt. Code sec. 66426 (West Supp. 1996), which provides:

> A tentative and final map shall be required for all subdivisions creating five or more parcels, five or
> (continued...)

was a condition precedent to Ridgemark's ability to convey legal title to the aforementioned parcels to Financial and Construction.

Ridgemark notes that it sold three parcels of real property between 1977 and 1984. Two were sold to Construction, and one was sold to Financial. For example, on October 18, 1977, Ridgemark deeded 7 acres of unsubdivided land to Construction for $175,000.

All properties sold after 1977 were conveyed after the final subdivision map was recorded. In particular, when Ridgemark agreed to sell the unit 9 property to Financial, there was a tentative map for the property. At the time of the sale on June 30, 1987, the final map for unit 9 had been recorded. A similar pattern occurred for units 7 and 8, which were sold to both Financial and Construction, respectively.

5. <u>The Use of a Business Office for the Sale of the Property</u>

Respondent places heavy reliance on the fact that Ridgemark compiled a list of names of people interested in purchasing lots in the unit 10 property. Ridgemark points out that the list was created several months after it had decided to proceed with a

---

[5](...continued)
more condominiums as defined in Section 783 of the Civil Code, a community apartment project containing five or more parcels, or for the conversion of a dwelling to a stock cooperative containing five or more dwelling units * * *

sale of all its assets, and therefore the list is not relevant to its intention regarding the unit 10 property.

Ridgemark had explored the options available to it with the intention of disposing of all its assets. Given that Shen had backed out of an earlier deal, we find it credible that Ridgemark sought alternatives in the event the transaction might not be consummated. One of the options was selling to another buyer. The possession of the names of potential buyers of the unit 10 property, by itself, is not dispositive of this issue.

The existence of a sales office is a weakness in Ridgemark's position, but not a fatal one. In this regard, the existence of a sales office did not result in sales for Ridgemark.

6. <u>The Time and Effort the Taxpayer Habitually Devoted to the Sales</u>

After the formation of the sister corporations, Construction and Financial, Ridgemark was substantially involved in the development and expansion of its golfing and recreational business.

Ridgemark's corporate minutes demonstrate that the board of directors spent significant portions of its time discussing the proposed transaction with Shen and various aspects of the golfing business.

There was a symbiotic relationship between the operation of Ridgemark Golf and Country Club and the sales of land. That interrelationship generated the dispute concerning Ridgemark's trade or business. Although Ridgemark pursued the sale of the

unit 10 property, that activity did not rise to the level of a trade or business. Instead, the real estate aspect was incidental to the primary business (golf) and constituted an investment so that the property was not part of Ridgemark's inventory.

Accordingly, we hold that Ridgemark was entitled to the nonrecognition of income from the sale of the unit 10 property under section 1031, and thus there is no underpayment to which section 6662(a) would be applied.

Finally, we consider whether petitioners are liable for the accuracy-related penalty for negligence under section 6662. Respondent determined that they were negligent or intentionally disregarded rules and regulations and that the section 6662(a) 20-percent penalty should apply. Sec. 6662(b)(1).

Negligence has been defined as the failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Petitioners bear the burden of showing that they were not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Respondent determined an accuracy-related penalty of $10,690 due to negligence or disregard of rules or regulations. Sec. 6662(b)(1) and (c). In the notice of deficiency, respondent determined that the depreciation deduction claimed by petitioners on their 1989 Schedule F exceeded the allowable amount by

$191,637.  Petitioners have conceded $174,030 of the proposed adjusted capital gain of $213,993.  Petitioners have also conceded the remaining adjustments.  However, respondent contends that petitioners were negligent with respect to the depreciation deductions.  Consequently, respondent asserts that the underpayment due to negligence was $53,452, out of the total underpayment of $124,324.[6]

Petitioners contend that they reasonably relied on the advice, expertise, and knowledge of their accountant.  However, petitioners have not presented specific evidence that reliance on their accountant, under the circumstances, was reasonable.  Thus, petitioners are liable for the accuracy-related penalty pursuant to section 6662(a).

<u>Decision will be entered under Rule 155 in docket No. 6105-93</u>.

<u>Decision will be entered for petitioner in docket No. 6106-93</u>.

---

[6] The issues related to the remaining underpayments of $70,872 have been resolved.